Beverly MUMM, as Trustee for the Surviving Spouse and Next of Kin of Duane P. Mumm, decedent, Respondent,

v.

Geralyn E. MORNSON, et al., Respondents,

v.

City of Minneapolis, et al., Appellants.

No. A04–729.

Supreme Court of Minnesota.

Jan. 10, 2006.

Jay M. Heffern, Timothy S. Skarda, Asst. City Atty., Minneapolis, for appellant.

Kurtis A. Greenley, DeAnne Hilgers, Lindquist & Vennum, P.L.L.P., Minneapolis, for respondent Mumm.

Robert T. Stich, Louise Annette Behrendt, Stich, Angell, Kreidler & Dodge, P.A., Minneapolis, for respondent Mornson.

James S. Ballentine, Schwebel Goetz & Sieben, Minneapolis, for amicus curiae MN Trial Lawyers Ass'n.

## OPINION

BLATZ, Chief Justice.

This case presents issues of qualified immunity and common law official immunity for police officers engaged in a vehicular pursuit of a mentally disturbed individual, as well as the issue of vicarious official immunity for the officers' employer, the City of Minneapolis. The case arose out of a police pursuit of Geralyn Mornson ("Mornson") that ended when police officers rammed their squad car into Mornson's vehicle, resulting in a crash in which Mornson's vehicle struck and killed a pedestrian. The decedent's spouse, Beverly Mumm ("Mumm"), filed this suit against Mornson and her husband, the owner of the vehicle that Mornson was driving, alleging negligence. Subsequently, Mumm and the Mornsons brought federal constitutional and state tort claims against the city and the officers for the officers' conduct during the pursuit.

The officers and city moved for summary judgment on immunity grounds. The district court denied the motion and the court of appeals affirmed. *Mumm v. Mornson,* No. A04–729, 2004 WL 2794421, at *5 (Minn.App. Dec. 7, 2004). We hold that the police officers are entitled to qualified immunity as to respondent Mumm's Fourteenth Amendment substantive due process claim, but that the officers are not entitled to summary judgment on qualified immunity as to respondent Mornson's Fourth Amendment claim. We also hold that the officers are not entitled to official immunity as to respondents' state law tort claims. Because we deny official immunity to the police officers, we hold that the City of Minneapolis is not entitled to vicarious official immunity. We therefore affirm in part and reverse in part.

In the late afternoon of March 28, 2002, Minneapolis Police Officer Lance DuPaul responded to a 911 call regarding a potentially suicidal woman, Mornson. Mornson was at her therapist's office when the therapist recommended that Mornson be transported to the hospital and placed the 911 call. Upon arriving at the therapist's office, DuPaul saw Mornson and her husband speaking with the therapist in the parking lot. DuPaul spoke briefly with the therapist but had no contact with Mornson. Mornson did not want to be transported to the hospital, but, instead, wanted to go to her church in Eden Prairie. While the others were talking, Mornson got into her husband's vehicle and drove out of the parking lot. DuPaul activated his squad car's emergency lights and siren and followed Mornson out of the parking lot, but Mornson continued driving, failing to stop for a stop sign.

With his lights and siren on, DuPaul followed Mornson from the therapist's office onto I–94. While on 94, DuPaul received a dispatch from Sergeant Kjos of the Minneapolis Police Department telling DuPaul to "call that chase off." A moment later, Lieutenant Doyle of the Minneapolis Police Department instructed DuPaul by radio to "monitor" Mornson with his siren off. In response, DuPaul turned off his lights and siren and continued to follow Mornson.

Both Mornson and DuPaul then proceeded southbound on I–35W. Another squad car, occupied by Minneapolis Police Officers Lappegaard and Brickley, joined DuPaul in following Mornson on 35W. Soon thereafter, two state patrol cars, one driven by State Patrol Officer Engelding-er, the other driven by State Patrol Officer

Brumm, joined the chase with their lights and sirens on. At that point, Lappegaard activated his lights and siren, concluding that he was engaged in a pursuit, not merely monitoring.

Mornson continued on 35W, driving on the shoulder at times and weaving in and out of traffic and on and off the road. She honked her horn frequently to induce other drivers to move out of her way. At one point, Mornson nearly hit the state patrol car driven by Brumm, which had pulled over on the shoulder of 35W. Doyle continued to instruct the Minneapolis police officers, eventually granting them permission to "take her out safely" if the use of stop sticks [1] proved inadequate to stop Mornson.

Mornson exited 35W and turned onto 60th Street in Richfield with the state patrol and Minneapolis police cars following. Mornson then turned south onto Nicollet Avenue. While driving southbound on Nicollet, Lappegaard tried to maneuver his squad car in front of Mornson's vehicle to stop her. When he was unable to get in front of Mornson's vehicle, Brickley told Lappegaard to "take her out," and Lappegaard turned the squad car to the right and made contact with the left side of Mornson's vehicle. Both officers claim that they felt that Mornson was a danger to the public because of her disturbed mental state and dangerous driving. After briefly straightening out, Lappegaard's squad car rammed Mornson's vehicle a second time, causing both vehicles to drive off the right side of the road.[2] When Mornson's vehicle left the road, it struck and killed Duane Mumm as he stood on the sidewalk.

As trustee for the surviving spouse and next of kin, Mr. Mumm's wife filed a complaint against Mornson and her husband alleging negligence. The Mornsons filed a third-party complaint against the city, Lappegaard, Brickley, and DuPaul, alleging a 42 U.S.C. § 1983 [3] claim arising from a Fourteenth Amendment substantive due process violation and also alleging negligence. Mumm amended her complaint to allege a similar substantive due process claim and negligence, assault, and battery claims against the city and the officers. The officers and the city moved for summary judgment on the grounds of qualified immunity as to the constitutional claims, official immunity as to the tort claims, and vicarious official immunity for the city. The district court denied their motion.

On appeal, the court of appeals affirmed the district court's denial of summary judgment. *Mumm*, 2004 WL 2794421, at *1. In support of its decision, the court of appeals concluded that, as to the issue of qualified immunity, material questions existed regarding the reasonableness of the officers' conduct that could not be answered without further development of the facts. *Id.* at *3–4. In addition, as to official immunity, the court of appeals determined that the officers' acts were discretionary, not ministerial, but noted that

---

1. Stop sticks are a row of hollow nails designed to be placed across a street to puncture the tires of a fleeing vehicle.

2. Although the parties dispute who initiated the second vehicular contact, on appeal from a denial of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party—here Mornson. *Molloy v. Meier*, 679 N.W.2d 711, 716 (Minn.2004).

3. "Section 1983 creates a remedy for violations, under color of state law, of rights, privileges, or immunities secured by the United States Constitution and certain federal statutes." *Vaughn v. Northwest Airlines, Inc.*, 558 N.W.2d 736, 740–41 (Minn.1997); *see* 42 U.S.C. § 1983 (2000).

further fact-finding was required to decide whether their conduct was willful or malicious and therefore outside the embrace of official immunity. *Id.* at *5. The city and officers filed a petition for further review on the questions of qualified immunity, official immunity, and vicarious official immunity, and we granted review. We also granted respondents' petition for cross-review of the court of appeals' conclusion that the officers' conduct was discretionary. We affirm the denial of summary judgment on official immunity grounds and the denial of summary judgment on qualified immunity grounds as to Mornson's Fourth Amendment excessive force claim. We reverse the denial of summary judgment on qualified immunity grounds as to Mumm's Fourteenth Amendment substantive due process claim.

## I.

■ The issues before us are whether the court of appeals erred in affirming the denial of summary judgment by holding that the police officers are not entitled to qualified immunity or official immunity and that the city is not entitled to vicarious official immunity. An order denying summary judgment on immunity grounds is immediately appealable. *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11,* 678 N.W.2d 651, 655 (Minn.2004); *Elwood v. County of Rice,* 423 N.W.2d 671, 675 (Minn.1988). In reviewing an appeal from the denial of summary judgment, we must determine whether there are genuine issues of material fact and whether the district court erred in applying the law. *Watson v. Metro. Transit Comm'n,* 553 N.W.2d 406, 411 (Minn.1996). When reviewing a summary judgment ruling, we must consider the evidence in the light most favorable to the nonmoving party. *Molloy,* 679 N.W.2d at 716. Immunity is a legal question that is reviewed de novo. *Anderson,* 678 N.W.2d at 655.

In our grant of review, we requested that the parties discuss what constitutional claims respondents have pled and what claims they can maintain, as the record below is unclear on these points. These issues must be resolved before questions of immunity can be addressed. The parties disagree over what constitutional claims are properly before us. Both Mumm and the Mornsons claim to have pled Fourth Amendment and Fourteenth Amendment claims, while the city and officers argue that respondents have pled only Fourteenth Amendment substantive due process claims.

■ The Minnesota Rules of Civil Procedure require that a complaint "contain a short and plain statement of the claim showing that the pleader is entitled to relief." Minn. R. Civ. P. 8.01. The complaint should put the defendant on notice of the claims against him. *See L.K. v. Gregg,* 425 N.W.2d 813, 819 (Minn.1988). When a plaintiff has not specified in the complaint the particular constitutional provisions that form the basis of his claims, we have at times nonetheless chosen to address the plaintiff's constitutional claims "if the facts alleged * * * state a claim." *Johnson v. Morris,* 453 N.W.2d 31, 35 n. 7 (Minn.1990); *Elwood,* 423 N.W.2d at 675. In *Johnson,* we concluded that despite the plaintiff's reference only to First and Fourteenth Amendment violations in the complaint, we would "address the issues as if [he] had pled a Fourth or Fifth Amendment violation." *Johnson,* 453 N.W.2d at 35 n. 7. We based this conclusion on the fact that the complaint as a whole put the defendants on notice that the use of excessive force was at issue. *See id.*

■ Mumm's amended complaint alleges "unconstitutional acts" by the officers that "include but are not limited to" the manner in which the pursuit was ter-

minated. The amended complaint also specifically includes a Fourteenth Amendment substantive due process claim. The Mornsons' third-party complaint alleges that the city and officers committed "negligent, intentional and/or unconstitutional acts or omissions" that "include but are not limited to" a Fourteenth Amendment substantive due process violation under 42 U.S.C. § 1983.[4]

Having reviewed the complaints and applying the standard set forth in *Johnson*, we conclude that both Mumm and the Mornsons have pled Fourth Amendment claims in addition to their Fourteenth Amendment due process claims. The allegations in the amended complaint and in the third-party complaint are sufficient to satisfy notice pleading requirements for a Fourth Amendment claim. The Mornsons' third-party complaint alleges a Fourth Amendment claim because it gives the officers notice of the possibility that other constitutional provisions may form the basis of their claim by using the language "including but not limited to." Further, and importantly, the third-party complaint clearly contests the officers' use of deadly force by alleging a violation of the state deadly force statute. Similarly, Mumm's amended complaint challenges the force used by the officers by asserting a battery claim, which impliedly contests the reasonableness of the force used. When combined with the broad language employed in Mumm's constitutional claims, these allegations provide adequate notice of a claim under the Fourth Amendment.

Our decision that Mumm and the Mornsons each have pled both a Fourth Amendment and a Fourteenth Amendment claim, however, does not conclude our inquiry of what claims they can maintain. The United States Supreme Court has held that where a particular constitutional amendment provides an "explicit textual source of constitutional protection" against a certain kind of governmental behavior, that particular "[a]mendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In applying this rule in *Graham*, the Court specifically held "that all claims that law enforcement officers have used excessive force" in effectuating a seizure "should be analyzed under the Fourth Amendment * * * rather than under a 'substantive due process' approach." *Id.* Thus, if either Mumm or Mornson can maintain a Fourth Amendment excessive force claim, the specific Fourth Amendment legal standard, rather than the Fourteenth Amendment's "more generalized notion of substantive due process," is the proper framework for our analysis of that claim.[5]

A Fourth Amendment excessive force claim requires two elements: (1) a seizure of the individual; and (2) unreasonable force in effectuating that seizure. *See Brower v. County of Inyo*, 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). A seizure does not always "occur whenever there is a governmentally caused

---

4. While both Mornson and her husband are third-party plaintiffs in this suit, the arguments in their brief to our court rely on alleged violations of Mornson's rights, not the rights of her husband. In analyzing the substance of the third-party claims, therefore, we will refer only to Mornson.

5. Mumm purports to assert both claims in the alternative. While claims may be pled in the alternative, once we have decided the threshold issue of whether a party can assert a Fourth Amendment claim, *Graham* requires us to analyze the claim under either the Fourth Amendment or the Fourteenth Amendment, but not under both. *See Graham*, 490 U.S. at 395, 109 S.Ct. 1865.

termination of an individual's freedom of movement," such as the inadvertent injury of an innocent passerby. *Id.* at 596–97, 109 S.Ct. 1378. Instead, a seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied.*" *Id.* at 597, 109 S.Ct. 1378. The Fourth Amendment is not meant to address "the accidental effects of otherwise lawful [police] conduct." *Id.* at 596, 109 S.Ct. 1378. While *Brower* notes that a seizure can occur when an "unintended person" is detained, the Supreme Court in that case was referring to situations where an officer purposefully seizes an individual who turns out not to be the person intended to be seized, i.e., a mistaken identity situation. *Id.* (citing *Hill v. California,* 401 U.S. 797, 802–05, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971)).

 Mornson was seized when Lappegaard and Brickley intentionally terminated her freedom of movement by ramming their squad car into her vehicle with the purpose of ending her flight. *See Brower,* 489 U.S. at 597, 109 S.Ct. 1378. Under *Graham,* therefore, Mornson can maintain only a Fourth Amendment claim. Mr. Mumm, however, was not seized. The officers did not intend to terminate his freedom of movement. In fact, they did not even know of his presence when they first struck Mornson's vehicle. *See Davis v. Twp. of Hillside,* 190 F.3d 167, 169 n. 1 (3d Cir.1999) (noting that a pedestrian struck by the vehicle of a fleeing suspect after the police intentionally rammed the vehicle states only a due process, not a Fourth Amendment, claim). Since Mr. Mumm was not seized, Mrs. Mumm cannot maintain a Fourth Amendment claim on his behalf and may only assert a substantive due process violation.

The court of appeals incorrectly concluded that it need not address the Fourth Amendment claims because of its decision to deny summary judgment on qualified immunity for the Fourteenth Amendment substantive due process claims. *Mumm,* 2004 WL 2794421, at *3. An official can be immune from a due process claim and not immune from a Fourth Amendment claim, or vice versa, because each constitutional claim calls for its own distinct immunity analysis. *Compare County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), *with Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Thus, in this case, denial of summary judgment on the Fourteenth Amendment due process claims does not determine whether the officers are immune from the Fourth Amendment excessive force claims. We therefore take up both Mumm's Fourteenth Amendment and Mornson's Fourth Amendment claims.

## II.

 We now address whether the police officers are protected by qualified immunity from the constitutional claims. Qualified immunity is a defense available to public officials sued for damages under 42 U.S.C. § 1983. *Elwood,* 423 N.W.2d at 674. Qualified immunity shields government officials from civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The United States Supreme Court analyzes qualified immunity in two steps. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. First, the Court determines whether the facts alleged are adequate to show a constitutional violation. *Id.* Second, the Court decides whether the law regarding the right allegedly violated "was clearly established." *Id.* Whether the law regarding the right was clearly established is a legal

question for the court. *Johnson,* 453 N.W.2d at 40; *Finch v. Wemlinger,* 361 N.W.2d 865, 870 n. 7 (Minn.1985). We first address qualified immunity as it relates to Mornson's Fourth Amendment claim, and then turn to the issue of qualified immunity on Mumm's Fourteenth Amendment substantive due process claim.

### A.

The officers argue that they are entitled to qualified immunity from Mornson's Fourth Amendment claim because Mornson has not adequately alleged a deprivation of Fourth Amendment rights and because the law regarding those rights was not clearly established. In turn, Mornson argues that she has alleged a Fourth Amendment violation by presenting evidence of a seizure involving excessive force. Mornson further contends that the law regarding her right to be free from the unreasonable use of deadly force was clearly established at the time of the accident.

■■■■ Following the Supreme Court's two-part qualified immunity analysis, we first inquire whether the facts asserted by Mornson demonstrate a Fourth Amendment violation. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Excessive force claims are evaluated for the objective reasonableness of the force used under the circumstances known to the officer at the time. *See id.* at 206–07, 121 S.Ct. 2151. In particular, the Court has held that deadly force may only be used to effectuate a seizure if "it is necessary to prevent the escape [of the suspect] and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officers or others." *Tennessee v. Garner,* 471 U.S. 1, 3, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Further, *Garner* requires police officers to give a warning, if feasible, before using deadly force to stop a fleeing suspect. *Id.* at 11–12, 105 S.Ct. 1694.

■■■■ Mornson claims that the officers' use of deadly force was unreasonable in that, at the time at which deadly force was used, Mornson did not pose a significant risk of serious harm to anyone. In his deposition, Lappegaard admitted that Mornson did not pose an immediate threat to other vehicular traffic at the time of the crash, as she was driving straight down the street with no cars nearby. Moreover, while Mornson's driving on 35W was reckless and potentially dangerous, she had not hit any vehicles or pedestrians during the chase, nor had she overtly threatened the officers or others. Further, when DuPaul first began following her, she had committed no crime. From these facts, one could conclude that Lappegaard and Brickley did not have probable cause to believe that Mornson posed a significant threat of serious injury to those around her, the high standard that *Garner* dictates must be met before deadly force may be used. *Id.* at 11, 105 S.Ct. 1694. Thus, in answering the first step of the qualified immunity analysis, we conclude that Mornson has adequately asserted a deprivation of her Fourth Amendment right to be free from the unreasonable use of deadly force.

The second step requires us to decide whether the law regarding the constitutional right was clearly established. To avoid application of qualified immunity, the law regarding Mornson's right to be free from the unreasonable use of force must have been clearly established at the time of the pursuit. The Supreme Court has given some guidance regarding the degree to which the law regarding a right must be clearly established. *Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that

what he is doing violates that right." *Id.* at 640, 107 S.Ct. 3034. Yet, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," but rather, "in light of the pre-existing law the unlawfulness must be apparent."[6] *Id.*

*Tennessee v. Garner* established the broad contours of the law regarding the constitutional use of deadly force. 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). *Garner* held that deadly force may be employed to effectuate a seizure only if "it is necessary to prevent the escape [of the suspect] and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officers or others." *Id.* at 3, 105 S.Ct. 1694. "Where the suspect poses no immediate threat to the officers and no threat to others," deadly force may not constitutionally be used. *Id.* at 11, 105 S.Ct. 1694. Thus, the question we must answer is whether it would have been clear to a reasonable officer in the position of Lappegaard and Brickley that they did not have probable cause to believe that Mornson posed a significant threat of death or serious injury to the officers or others. *See Saucier,* 533 U.S. at 202, 121 S.Ct. 2151.

The Supreme Court has not applied the holding of *Garner* to a situation factually similar to this case. The Court, however, has recently weighed in on whether the law regarding the right to be free from the unreasonable use of deadly force is clearly established in a given case. *See Brosseau v. Haugen,* 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). *Brosseau* involved an officer who shot a wanted felon as the felon fled in a vehicle. 543 U.S. at 196–97, 125 S.Ct. at 598. The officer believed that the felon entered the vehicle to obtain a weapon and was concerned for the safety of people in a nearby car as well as police officers on foot in the area. *Id.* The Court held that a fleeing felon's right to be free from the application of deadly force was not clearly established in situations where "persons in the immediate area are at risk from that flight." *Id.* at 200, 125 S.Ct. at 600.

The Supreme Court in *Brosseau* noted that *Garner* by itself does not give police officers notice of the impermissibility of the use of deadly force in all situations because the *Garner* decision is "cast at a high level of generality." *Id.* at 199, 125 S.Ct. at 599. Nonetheless, where a "general constitutional rule" applies with "obvious clarity" to a particular situation, the law is considered to be clearly established, even without case law concerning a factually identical situation. *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). Thus, *Garner* alone can clearly establish the impermissibility of the use of deadly force in the "obvious case." *Brosseau,* 543 U.S. at 199, 125 S.Ct. at 599.

This is just such a case. When viewing the evidence in the light most favorable to Mornson, a reasonable officer would have known, at the time deadly force was used, that there was not probable cause to believe that Mornson posed a significant threat of serious injury to others. Though Mornson had committed several traffic violations during the course of the pursuit,

---

**6.** The determination of whether an officer could reasonably have believed that his conduct was lawful differs from the analysis of whether the force used was reasonable. *Saucier,* 533 U.S. at 205–06, 121 S.Ct. 2151. An officer can use unreasonable force, in violation of the Fourth Amendment, yet still be immune from personal liability if his *mistake* as to what force was permitted was reasonable, given the state of the law at the time. *Id.*

she had not struck or injured anyone or anything at the time when deadly force was used. While driving erratically earlier, Mornson retained apparent control over her vehicle throughout the pursuit and never purposefully sought to crash her vehicle into another vehicle or person. In fact, a video of the chase shows Mornson maneuvering to avoid hitting cars on 35W. Although Mornson's driving on 35W was reckless and potentially dangerous, a reasonable officer would know that the sort of reckless driving that Mornson engaged in does not justify the use of deadly force under the *Garner* standard. Further, at the time when Lappegaard and Brickley chose to use deadly force, the risk posed by Mornson's driving had lessened. She was driving straight down the street in the proper lane, posing no immediate threat to the officers or others.

The qualified immunity inquiry in excessive force cases is very fact specific. *See Creighton*, 483 U.S. at 641, 107 S.Ct. 3034. For that reason, the Eleventh Circuit's decision in *Harris v. Coweta County, Georgia*, presenting facts quite similar to those in this case, is instructive. 406 F.3d 1307 (11th Cir.2005). In *Harris*, the Eleventh Circuit denied police officers qualified immunity on a Fourth Amendment deadly force claim arising from their purposeful ramming of a squad car into the vehicle of a fleeing suspect. *Id.* at 1321. In *Harris*, the court determined that the *Garner* rule applied "with obvious clarity" because the suspect's only crimes were traffic violations and fleeing from the police. *Id.* at 1318. The court concluded that it would be clear to a reasonable officer that deadly force could not be used against a fleeing suspect who was initially pursued for speeding and who was not suspected of any violent crimes. *Id.* at 1318–20; *cf. McCaslin v. Wilkins*, 183 F.3d 775, 777–79 (8th Cir.1999) (denying summary judgment on qualified immunity grounds for police

officers who shot a fleeing suspect because factual disputes existed as to the police conduct, but suggesting that the officers may not have been entitled to immunity).

The facts of this case are more akin to the facts of *Harris* than to those of *Brosseau*. Unlike the suspect in *Brosseau*, Mornson had committed no crime at the time the pursuit was initiated—she was not a wanted felon. Moreover, Lappegaard and Brickley knew that Mornson did not have any firearms or other weapons in her car, unlike in *Brosseau*. Also, the officers here offer no evidence of any people "in the immediate area" who were at risk from Mornson's flight at the time deadly force was used. As in *Harris*, Mornson's only crimes were traffic violations and fleeing from police. The officers had no indication at the time deadly force was used that Mornson would have caused injury to others had she simply been permitted to escape.

In deciding whether the law regarding Mornson's right to be free from the application of excessive force was clearly established, we must inquire as to how a reasonable officer would interpret the threat that Mornson posed in light of the information that Lappegaard and Brickley had at the time deadly force was used. The evidence indicates that Lappegaard and Brickley had been informed that Mornson was suicidal and that Brickley had heard DuPaul tell the dispatcher that Mornson "pushed away from me several times," which Brickley interpreted to mean that Mornson had assaulted DuPaul. While, in fact, no physical contact occurred between DuPaul and Mornson, Lappegaard and Brickley did not know that until after the crash.

Because the law requires that Mornson pose a significant threat to the police or to others in order to justify the use of deadly force, the mere risk of suicide does not

justify the use of deadly force. Moreover, it is important to recognize that not all levels of mental disturbance or forms of mental illness necessitate such extraordinary intervention. The fact that a person suffering from a mental disturbance or mental illness drives recklessly to evade police does not automatically signal to police that the individual poses a significant threat of serious injury to others.

Even when coupled with the alleged "pushing away"—albeit an untrue allegation—a suicidal person's risk of injury to self does not support the use of deadly force as authorized in *Garner*. Instead, the facts of this case demonstrate that any risk that Mornson may have posed to the officers was largely due to their pursuit of her. It is difficult to see how Mornson could have posed an "immediate threat" to the officers at a time when she was trying to drive *away* from them. *See Harris,* 406 F.3d at 1319 n. 12.

Given that Mornson's only crimes were traffic violations and her refusal to stop for police and given the evidence that Mornson did not overtly seek to injure anyone either before or during the chase, it would have been clear to a reasonable officer that he did not have probable cause to believe that Mornson posed a significant risk of serious injury to the police or others. Moreover, Lappegaard gave Mornson no warning that deadly force would be used— another aspect of the *Garner* deadly force standard. *See Harris,* 406 F.3d at 1319 n. 12. Because the officers should have known that the prerequisites for the constitutional use of deadly force had not been met, we hold that they are not entitled to summary judgment on qualified immunity grounds as to Mornson's Fourth Amendment claim.

### B.

■ The same two-part analysis set forth above applies to the officers' asser-

tion of qualified immunity from Mumm's substantive due process claim. Again, we must first determine whether Mumm has adequately asserted a deprivation of a constitutional right. *See Lewis,* 523 U.S. at 841 n. 5, 118 S.Ct. 1708. A cognizable claim of a Fourteenth Amendment substantive due process violation must describe governmental conduct so egregious that it "shocks the conscience." *Rochin v. California,* 342 U.S. 165, 172–74, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Only the most extreme instances of governmental misconduct satisfy this exacting standard. *Compare Neal ex rel. Neal v. Fulton County Bd. of Educ.,* 229 F.3d 1069, 1075–76 (11th Cir.2000) (concluding that a teacher's conduct in striking a student in the face with a metal weight as punishment, resulting in the student's loss of an eye, shocks the conscience), *with Cummings v. McIntire,* 271 F.3d 341, 343–47 (1st Cir.2001) (concluding that a police officer's violent shoving and swearing at a pedestrian who asked the officer for directions did not constitute conscience-shocking conduct), *and London v. Dirs. of the DeWitt Pub. Sch.,* 194 F.3d 873, 876–77 (8th Cir.1999) (concluding that a teacher's dragging a student fifteen feet and banging the student's head against a metal pole did not shock the conscience).

■ In the context of police vehicular pursuits, the Supreme Court has specifically held that only conduct evincing "a purpose to cause harm unrelated to the legitimate object of arrest" constitutes conscience-shocking conduct. *Lewis,* 523 U.S. at 836, 118 S.Ct. 1708. The Court expressly rejected a "deliberate indifference" standard for police chases, noting that such a "standard is sensibly employed only when actual deliberation is practical." *Id.* at 851, 118 S.Ct. 1708. The Eighth Circuit has interpreted *Lewis's* "intent-to-injure"

standard as applying broadly to *all* high speed police chases, even if the facts reveal that deliberation was feasible or that the police did actually deliberate. *Helseth v. Burch,* 258 F.3d 867, 871 (8th Cir.2001). The Eighth Circuit has held that the *Lewis* standard applies whenever police subjectively believe that they are responding to an emergency situation. *Terrell v. Larson,* 396 F.3d 975, 980 (8th Cir.2005). The Eighth Circuit has also applied the *Lewis* standard in a case where a bystander, not the fleeing suspect, was injured. *See Helseth,* 258 F.3d at 872. Thus, within the Eighth Circuit's framework, for an innocent bystander to recover, the police must have evinced "a purpose to cause harm [to Mornson] unrelated to the legitimate object of arrest." *Helseth,* 258 F.3d at 872 (emphasis omitted); *see also Lewis,* 523 U.S. at 836, 118 S.Ct. 1708. Unlike the objective Fourth Amendment standard for the use of deadly force, the substantive due process standard is a subjective one.[7] *See Terrell,* 396 F.3d at 979–80.

Acknowledging the *Lewis* standard, Mumm argues that she has alleged a Fourteenth Amendment due process claim by setting forth evidence of the police officers' intent to injure Mornson and deliberate indifference to Mornson's rights.[8] The officers disagree, contending that Mumm has not offered any evidence that the officers had an intent to harm Mornson that was unrelated to a legitimate law enforcement purpose and that Mumm's Fourteenth Amendment claim therefore fails. While the court of appeals agreed with the officers that intent to injure is the appropriate standard, the court held that further fact-finding is required to determine whether the officers had an intent to injure unrelated to a legitimate law enforcement purpose.[9] *Mumm,* 2004 WL 2794421, at *2–3.

Mumm contends that *Lewis* and *Terrell* leave the door open for a deliberate indifference standard in situations where a police officer's claim of an emergency is made in bad faith. To satisfy this standard, Mumm asserts that the officers' conduct was deliberately indifferent toward Mornson's rights. Contrary to this argument, the broad holding in *Lewis* appears to have set forth an across-the-board standard of intent to injure for all police chases. *See Lewis,* 523 U.S. at 854, 118 S.Ct. 1708 ("[W]e hold that high-speed chases with no intent to harm suspects physically * * * do not give rise to liability under the Fourteenth Amendment * * *."). In *Terrell,* the Eighth Circuit merely stated that it was *not deciding* whether a deliberate indifference standard applies to situations when an officer's claim that an emergency exists was made in bad faith. *Terrell,* 396 F.3d at 980 n. 2. The court did not affirmatively conclude that deliberate indifference applies in those situations. *Id.*

7. The dissent blurs this significant distinction between the Fourth Amendment and Fourteenth Amendment standards. The dissent appears to separate the intent-to-injure and the legitimate-law-enforcement-purpose aspects of the substantive due process test, applying a subjective standard to the former and an objective standard to the latter, but cites no authority for this use of an objective standard in the substantive due process analysis.

8. It is the intent to injure Mornson that is required, not the intent to injure the bystander, Mr. Mumm. *See Helseth,* 258 F.3d at 872; *id.* at 877 (Bye, J., dissenting).

9. The court of appeals also noted that further proceedings are needed to determine the reasonableness of the police conduct. *Mumm,* 2004 WL 2794421, at *3. The court's basis for this statement is unclear, however, because the test for substantive due process violations does not involve a reasonableness inquiry. *See Lewis,* 523 U.S. at 836, 118 S.Ct. 1708.

Even if there is a lower due process standard for fabricated emergencies, it does not apply to this case. The record does not contain any evidence that the officers' claim that an emergency existed was made in bad faith. Both Lappegaard and Brickley testified that they believed that Mornson was a danger to the public, given their knowledge of her unstable mental condition and reckless driving. Also, while DuPaul's initiation of pursuit may have contributed to the emergency situation, Mornson was clearly in crisis when DuPaul arrived. DuPaul testified that he initiated pursuit out of concern for Mornson's welfare, and Mumm presents no evidence to refute that claim. Thus, the *Lewis* intent-to-injure standard is the appropriate standard under which to analyze Mumm's substantive due process claim.

■ Having decided to apply the intent-to-injure standard, we now address whether the officers' conduct satisfies that standard, thus depriving them of qualified immunity. While Lappegaard and Brickley knew their use of deadly force would likely injure Mornson, mere knowledge that injury is probable is not necessarily the equivalent of intent to injure. *See Davis*, 190 F.3d at 171 ("*Lewis* does not permit an inference of intent to harm simply because a chase eventuates in deliberate physical contact causing injury."); *see also Helseth*, 258 F.3d at 872. Further,

even if Lappegaard and Brickley did intend to harm Mornson, intent to injure alone is not sufficient; the intent to injure must be unrelated to a legitimate law enforcement purpose. *See Lewis*, 523 U.S. at 836, 840, 849, 118 S.Ct. 1708; *Davis*, 190 F.3d at 171. Mumm contends that the ramming of Mornson's vehicle was not related to a legitimate law enforcement purpose because Lappegaard and Brickley were trying to "help" Mornson, not arrest her, and using deadly force did not further that goal.

■ Both Lappegaard and Brickley, however, testified that they employed deadly force not to help Mornson but rather to protect the public from Mornson's unstable condition and dangerous driving.[10] Mumm does not present evidence contradicting these statements. The only evidence that Mumm presents on this point is Brickley's statement that he became "personally involved" in the chase. While the meaning of "personal involvement" is not self-evident, the mere use of those words does not disprove Brickley's asserted purpose to protect the public. Protecting the public from a mentally disturbed individual's dangerous driving and unlawful flight from police is a legitimate law enforcement purpose.[11] Our earlier conclusion that a reasonable officer would have known that Lappegaard and Brickley could not constitutionally use deadly force against Mornson is not determinative of the Fourteenth

10. Under the *Lewis* substantive due process standard—unlike the objective standard employed in the Fourth Amendment analysis—it is the officers' *subjective* intent that is the relevant inquiry here. *See Terrell*, 396 F.3d at 980.

11. The dissent relies on the officers' violation of Minneapolis Police Department policies to reach its conclusion that the officers lacked a legitimate law enforcement purpose. *Lewis* itself reveals that such reliance on violations of police department policies is misplaced.

In *Lewis,* the police pursuit was held not to constitute a substantive due process violation despite the fact that the officers had violated several police department policies during the pursuit. *See Lewis,* 523 U.S. at 838–39, 855, 118 S.Ct. 1708. "*Lewis* thus squarely refutes [the] contention that the officers' violation of police department regulations * * * suffices to meet the shocks-the-conscience test under the due process clause." *Davis,* 190 F.3d at 170.

Amendment claim, as the dissent suggests. An officer's poor judgment in using unreasonable force does not automatically convert the officer's acts into conscience-shocking conduct. The substantive due process "shocks the conscience" standard is a much higher standard for a plaintiff to meet than the objective unreasonableness standard of the Fourth Amendment. *See Carr v. Tatangelo*, 338 F.3d 1259, 1272 (11th Cir.2003); *Scott v. Clay County, Tenn.*, 205 F.3d 867, 876 (6th Cir.2000). Thus, we hold that, under the *Lewis* intent-to-injure standard, Mumm has not sufficiently asserted a deprivation of Mr. Mumm's substantive due process rights, and Mumm's due process claim must be dismissed. Given this conclusion, we need not reach the issue of whether Mumm's substantive due process rights were clearly established.

## III.

We next turn to the question of common law official immunity for the police officers. Official immunity provides a public official with a defense to state law claims, such as the tort claims asserted in this case. *See Johnson*, 453 N.W.2d at 41; *Elwood*, 423 N.W.2d at 677. Official immunity prevents " 'a public official charged by law with duties which call for the exercise of his judgment or discretion' " from being held personally liable for damages, unless the official has committed a willful or malicious act. *Elwood*, 423 N.W.2d at 677 (quoting *Susla v. State*, 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976)). Official immunity enables public employees to perform their duties effectively, without fear of personal liability that might inhibit the exercise of their independent judgment. *Anderson*, 678 N.W.2d at 655. In conducting an official immunity analysis, we first determine whether the conduct at issue involves ministerial or discretionary duties. If the duties are discretionary, we then

decide whether the officials acted willfully or maliciously. *See Elwood*, 423 N.W.2d at 679.

The court of appeals concluded that the police pursuit in this case falls within the wide range of discretionary police conduct. *Mumm*, 2004 WL 2794421, at *4. The court cited language from our prior cases describing police conduct as typically discretionary. *Id.* The court denied official immunity, however, based on its conclusion that issues of fact remain as to whether the officers' conduct was willful or malicious. *Id.* at *5. Mumm and the Mornsons challenge the court's conclusion that the officers' conduct was discretionary.

Before we analyze the application of official immunity, we must first identify the precise governmental conduct at issue. *Anderson*, 678 N.W.2d at 656. In this case, Mumm and the Mornsons identify two police actions at issue: 1) the officers' pursuit of Mornson; and 2) the officers' use of deadly force against Mornson.

Focusing on the specific actions at issue, we first inquire whether the officers' acts were ministerial or discretionary. In analyzing whether an act is ministerial or discretionary, "the focus is on the nature of the act." *Id.* A ministerial act is one that is " 'absolute, certain and imperative, involving merely the execution of a specific duty arising from fixed and designated facts.' " *Cook v. Trovatten*, 200 Minn. 221, 224, 274 N.W. 165, 167 (1937) (quoting *People v. May*, 251 Ill. 54, 95 N.E. 999, 1000 (1911)). A ministerial duty leaves nothing to discretion; it is " 'a simple, definite duty arising under and because of stated conditions.' " *Larson v. Indep. Sch. Dist. No. 314*, 289 N.W.2d 112, 119 (1979) (quoting *Cook*, 200 Minn. at 224, 274 N.W. at 167). In contrast, a duty is discretionary if it involves "more individual professional judgment that necessarily re-

flects the professional goal and factors of a situation." *Wiederholt v. City of Minneapolis,* 581 N.W.2d 312, 315 (1998).

Relying on state statutes and the police department's own policies, Mumm and the Mornsons assert that the officers' conduct was ministerial. The Minneapolis Police Department Vehicle Operation Policy ("Pursuit Policy"), on which Mumm and the Mornsons heavily rely, provides in relevant part:

> Officers shall not initiate a pursuit or shall discontinue a pursuit in progress whenever any of the following conditions exists:
>
> * * *
>
> (2) the officer can establish the identification of the offender so that an apprehension can be made at another time unless the crime is for homicide, 1st and 2nd degree assault, aggravated robbery, sexual assault involving the use or threatened use of a dangerous weapon, [or] kidnapping.[12]

MPD Policy Manual § 7–405. Mumm and the Mornsons also cite the Minneapolis Police Department policy on the use of deadly force and the Minnesota deadly force statute, both of which provide that deadly force may be used only when it is reasonably necessary "to protect the peace officer or another from apparent death or great bodily harm."[13] Minn.Stat. § 609.066, subd. 2 (2004); MPD Policy Manual § 5–306. Mumm and the Mornsons argue that police officers' decisions in situations governed by these policies do not allow for discretion and thus are ministerial. In their view, officers are required

merely to follow the dictates of the policies. The city and the officers disagree, arguing that our prior police immunity cases dictate the conclusion that the officers' decisions to pursue Mornson and to use deadly force were discretionary because they were responding to an emergency.

The existence of a government policy mandating certain conduct by public officials can influence whether a duty is classified as ministerial or discretionary. *See Anderson,* 678 N.W.2d at 658–59. In *Anderson,* we concluded that the existence of a policy that sets a sufficiently narrow standard of conduct will make a public employee's conduct ministerial if he is bound to follow the policy. *Id.* at 659. In an earlier case, we similarly determined that a sidewalk inspector's failure to comply with a policy requiring him to immediately repair sidewalk protrusions greater than one inch was a ministerial act. *Wiederholt,* 581 N.W.2d at 314. When a public employee has a ministerial duty to engage in certain conduct and fails to do so, his actions are not protected by official immunity. *Anderson,* 678 N.W.2d at 660.

The policy at issue in this case imposed a ministerial duty, which the officers failed to perform. The officers do not dispute that they knew Mornson's identity at the time the pursuit was initiated and that they knew that Mornson had not committed any of the felonies listed in section 7–405 of the Pursuit Policy. Under these circumstances, section 7–405 imposes a mandatory duty to refrain from initiating or to discontinue pursuit.[14] When police

---

12. The Pursuit Policy defines "offender" as "the operator of a vehicle being pursued who had been signaled to stop," a definition that includes Mornson. MPD Policy Manual § 7–400.

13. The statute and policy each list two other situations in which deadly force may be used,

neither of which is applicable in this case. Minn.Stat. § 609.066, subd. 2; MPD Policy Manual § 5–306.

14. The officers contend that the Pursuit Policy does not apply to the chase in this case because it involved a mentally disturbed individ-

know the identity of a fleeing individual, the policy instructs that police *shall discontinue* the pursuit. The plain language of this portion of the policy gives officers no discretion to exercise independent judgment. Section 7–405 imposes a narrow and definite duty on an officer facing a particular set of circumstances, rendering that officer's duty ministerial.

The officers argue that the final paragraph of section 7–405 of the Pursuit Policy gives them discretion over the decision to terminate a pursuit. The last paragraph of section 7–405 states that "officers involved in a pursuit have the right to decide whether or not to terminate their participation in a pursuit." Nothing indicates that this phrase overrides the obligation, set forth earlier in section 7–405, to terminate a pursuit where the officers know the suspect's identity. Instead, this general termination provision provides officers with discretion to terminate pursuits in situations not expressly covered by the previously-listed rules. Widely-accepted rules of construction dictate that specific provisions control over general provisions. *See* Minn.Stat. § 645.26, subd. 1 (2004). We therefore hold that the officers had a ministerial duty, imposed by section 7–405 of the Pursuit Policy, to discontinue their pursuit of Mornson because they knew Mornson's identity and knew she had not committed any of the listed felonies. Because the officers failed to perform this ministerial duty, they are not entitled to official immunity for their decision to initiate and continue the pursuit.

In so holding, we reject the officers' request that we conclude that all police conduct in emergency situations is discretionary and thus entitled to official immunity unless it is willful or malicious. We recognize that we have previously described police conduct in emergency situations as typically being discretionary. *Kelly v. City of Minneapolis,* 598 N.W.2d 657, 664 (Minn.1999); *Johnson,* 453 N.W.2d at 42. In the context of police pursuits, we have concluded that "decisions of police officers to engage in and to continue vehicular pursuit of fleeing criminal suspects are protected by official immunity" because such decisions are discretionary. *Pletan v. Gaines,* 494 N.W.2d 38, 41 (Minn. 1992); *see also Kari v. City of Maplewood,* 582 N.W.2d 921, 922, 925 (Minn.1998) (holding that the conduct of a city ambulance driver, who struck and killed a pedestrian after failing to yield in a crosswalk, was entitled to the "broad category of immunity granted to officials responding to emergencies," despite the fact that the driver had violated a state statute regarding the right of way).

Nonetheless, these cases are distinguishable from the facts of this case. In distinguishing these cases, we recognize that the doctrine of official immunity is a complex and difficult area of law that must be applied to ever-changing fact patterns and governmental policies. For example, while the police pursuit in *Pletan* was guided by police department policies, the pursuit policy in *Pletan* reserved substantial discretion for police officers, unlike the policies in *Anderson* and *Wiederholt. See Pletan,* 494 N.W.2d at 41 n. 3. For instance, one relevant section of the pursuit policy in *Pletan* required police to "continually question whether the seriousness of the

---

ual, not a criminal. The plain language of the policy, however, belies this argument. The policy applies when a pursuit is conducted. "[A] vehicular pursuit occurs whenever an officer pursues a driver of a vehicle who has been given a signal to stop by the activation of

red lights and siren, and the suspect or violator fails to comply and attempts to elude the officer by taking evasive actions." Mornson was a violator because she refused to stop when signaled to do so by DuPaul and attempted to elude the officers.

violation reasonably warrants continuation of the pursuit"; another section required police to discontinue pursuit when the pursuit posed a "clear danger" to the public. *Pletan,* 494 N.W.2d at 41 n. 3. In contrast with the express dictates of the Pursuit Policy at issue in this case, the vague terms of the policy in *Pletan* gave little specific guidance to police and set few limits on their independent exercise of judgment. *See id.*

Similarly, the *Kelly* case is also inapposite. In *Kelly,* we adopted a somewhat different approach to the ministerial/discretionary issue than we currently employ. We did not focus on "the precise conduct at issue" and thus saw no need to zero in on any specific police policies. *See Kelly,* 598 N.W.2d at 665 (defining the conduct at issue as the entire process of "making an arrest"). Further, *Kelly* did not involve a precisely drawn policy specifically designed by a police department to govern conduct in emergency driving situations, as does the Pursuit Policy in this case.

We believe that the city and the officers ask too much in urging us to conclude that all police conduct in emergency situations is discretionary. We do not read our previous cases as establishing the broad proposition that all police conduct in emergencies is discretionary, even in the face of binding police department policies. Indeed, while often necessary, police pursuits by definition are emergency situations, jeopardizing the safety and lives of those involved, as well as innocent bystanders. We recognize that governmental entities have the authority to eliminate by policy the discretion of their employees, as was done by the Minneapolis Police Department in its Pursuit Policy. By adopting policies specifically intended to apply to pursuits, the Minneapolis Police Department implicitly recognizes that officers should not have unfettered discretion in

emergency situations. Moreover, the existence of such policies reveals a belief that certain situations do not justify the creation of the risk attendant to police chases.

Having determined that the officers are not entitled to official immunity for their decision to pursue Mornson, and given the unique facts of this case, we conclude that we need not analyze separately the issue of official immunity for the officers' use of deadly force. From the record before us, it is apparent that the officers' use of deadly force was an integral part of the pursuit. Further, the City of Minneapolis is not entitled to vicarious official immunity because the officers do not have official immunity. *See Wiederholt,* 581 N.W.2d at 314, 316.

Affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion.

PAGE, J., took no part in the consideration or decision of this case.

HANSON, Justice (concurring and dissenting).

Although I agree with the majority's conclusion that the police officers are not entitled to qualified immunity from Mornson's Fourth Amendment claim and are not entitled to common law official immunity from Mornson's and Mumm's common law claims, I respectfully dissent from the majority's conclusion that Mumm does not adequately state a Fourteenth Amendment substantive due process claim.

Although the legal standards for liability and immunity for a Fourth Amendment claim differ to some degree from that for a Fourteenth Amendment claim, under the unique facts of this case they merge into the identical dispositive fact issue. This is because the justification offered by the police officers for the use of deadly force in response to the Fourth Amendment claim

is the same justification they offer to establish a legitimate law enforcement purpose under the Fourteenth Amendment. As noted in the majority opinion, both Lappegaard and Brickley testified that "they applied deadly force not to help Mornson but rather to protect the public from Mornson's unstable condition and dangerous driving." That justification is flatly rejected in the majority's Fourth Amendment analysis but is given controlling credibility in the majority's Fourteenth Amendment analysis. Just as the majority concludes under the Fourth Amendment objective analysis that a reasonable officer would have known that there was no probable cause to use deadly force against Mornson, I would conclude under the Fourteenth Amendment subjective analysis that these officers knew they did not have a legitimate law enforcement purpose to use deadly force against Mornson.

While discussing the Fourth Amendment claim, the majority states that "one could conclude that Lappegaard and Brickley did not have probable cause to believe that Mornson posed a significant threat of serious injury to those around her." In fact, in discussing whether this lack of probable cause was clearly established under constitutional law, the majority concludes that "[w]hen viewing the evidence in the light most favorable to Mornson, a reasonable officer would have known, at the time deadly force was used, that there was not probable cause to believe that Mornson posed a significant threat of serious injury to others." These conclusions reject Lappegaard's and Brickley's reliance on Mornson's "dangerous driving" as providing them with "a legitimate law enforcement purpose" to pursue or use deadly force. And the majority similarly rejects Mornson's "unstable condition" as providing a legitimate basis to pursue or use deadly force, stating that "the mere

risk of suicide does not justify the use of deadly force." The majority concludes that "the facts of this case demonstrate that any risk that Mornson may have posed to the officers was largely due to their pursuit of her."

This Fourth Amendment analysis stands in sharp contrast to the majority's analysis, under the Fourteenth Amendment, where the majority accepts Lappegaard's and Brickley's testimony at face value to conclude that "[p]rotecting the public from a mentally disturbed individual's dangerous driving and unlawful flight from police is a legitimate law enforcement purpose." This difference in analysis is not justified by the use of an objective standard for the Fourth Amendment and a subjective one for the Fourteenth Amendment for two reasons. First, the subjective inquiry under the Fourteenth Amendment analysis is whether the officers had a "purpose to cause harm." Here, the officers acknowledged that they understood that their use of deadly force would cause harm to Mornson. Although the full statement of the text under *Lewis* is "a purpose to cause harm unrelated to the legitimate object of arrest," in my view the question of whether the officers had a legitimate law enforcement purpose for their actions depends on the facts known to the officers, not on their intent. Those facts, as the majority concludes, do not support probable cause to believe that Mornson posed a threat of serious injury to others.

Second, even if the officers' intent was relevant to whether they were pursuing a legitimate law enforcement purpose, an injured party should not be bound by the officers' self-serving statements of their intent, but should be permitted to disprove those statements by circumstantial evidence. In that connection, I disagree with the majority's suggestion that Mumm did not present evidence to contradict the

statements of Lappegaard and Brickley that there was a need to protect the public from Mornson's unstable condition and dangerous driving. The majority elsewhere agrees that the evidence shows that any mental disturbance Mornson may have been suffering did not reflect itself in her driving which, but for the effects of the pursuit by police, was under control and consistent with all traffic laws. More importantly, Mumm presented substantial evidence that the pursuit and the use of deadly force by Lappegaard and Brickley were not related to a legitimate law enforcement purpose.

I doubt that there could be a legitimate law enforcement purpose to pursue and use deadly force against someone where there is no probable cause to believe that the person either had committed a crime or posed a significant threat to others. The majority agrees that the evidence shows that neither is present here.

Further, Mumm has shown that the officers' pursuit was in violation of a clear Minneapolis Police Department policy which required them to discontinue the pursuit where the pursuit itself might create an unreasonable risk to the officers or the public and the officer can establish the identification of the person being pursued. Similarly, the use of deadly force was in violation of the statutory prohibition against the use of deadly force by a peace officer where not necessary to "protect the peace officer or another from apparent death or great bodily harm." Minn.Stat. § 609.066, subd. 2 (2004). Although violations of policy and law may not necessarily show intent to injure, they certainly show that the actions were not pursuant to any "legitimate" law enforcement purpose.

The illegitimacy of the officers' actions is even more clearly demonstrated by the evidence that Sergeant Kjos, a Minneapolis police supervisor, twice ordered the officers to discontinue the pursuit and that Lieutenant Lawrence Doyle of the Minneapolis Police Department ordered the officers to monitor Mornson without lights and sirens and never authorized the officers to resume a pursuit. Yet, as the state patrol video dramatically shows, the pursuit continued with full lights and sirens in violation of directives from supervisors.

Finally, Mumm provided evidence that Brickley, who had been trained in crisis intervention for assisting people with mental problems, understood that sirens were not to be used because they would irritate and aggravate someone who is suffering from a mental disturbance. Yet, Brickley not only used full lights and sirens, he sought permission to "take her out," meaning to use deadly force against Mornson. And then Brickley disregarded the denial of his request. Ultimately, Lieutenant Doyle directed the officers to attempt "stop sticks" and only to "take out" Mornson if the stop sticks are not working. The video records that, within only a few blocks of the ultimate crash, an unidentified officer asked "do we have authorization to take her out?" and the response he received from another unidentified officer was "negative, assist only-stop sticks only."

Fifth, although the majority sees some ambiguity in Brickley's acknowledgement that the pursuit became "personal" to him, Brickley's deposition testimony makes the meaning of that acknowledgement clear. He said he had decided to do whatever it took to stop the chase, including taking out a gun and shooting Mornson. In fact, when asked whether he meant he would have used his gun to shoot her tires, he responded "I wouldn't have shot out the tires, I would have shot her."

This evidence shows that Lappegaard and Brickley had an intent to injure Mornson. This evidence also shows that the

officers did not have any legitimate law enforcement purpose in continuing the pursuit or in using deadly force. As a result, I would conclude that Mumm has stated a Fourteenth Amendment substantive due process claim against the police officers. As to the second step of the Fourteenth Amendment qualified immunity analysis, I would conclude that the right to be free from a police officer's use of deadly force without probable cause and without any legitimate law enforcement purpose is so clear under the constitution that it does not warrant discussion. Accordingly, I would hold that the police officers are not entitled to qualified immunity with respect to Mumm's Fourteenth Amendment claim and that the court of appeals properly affirmed the district court's denial of the officers' motion for summary judgment on that claim.