Scott D. AUGUSTINE, M.D., Appellant,

v.

ARIZANT INC., et al., Respondents.

No. A06–12381.

Supreme Court of Minnesota.

June 26, 2008.

David Richard Marshall, Fredrikson & Byron, P.A., Minneapolis, for appellant.

David B. Potter, Oppenheimer Wolff & Donnelly, Minneapolis, for respondent.

Michael E. Robinson, Dept. of Justice, Washington, DC, for U.S.

John Steven Garry, St. Paul, for State.

OPINION

ANDERSON, G. BARRY, Justice.

Appellant Scott D. Augustine, M.D., founder and former officer of respondent Augustine Medical, Inc., pleaded guilty to a misdemeanor violation of 42 U.S.C. § 1320a–7b(a)(2) (2000) and 18 U.S.C. § 2 (2000). Appellant sought indemnification for his fine and attorney fees from respondent Arizant, Inc., Augustine Medical's parent company. Arizant refused appellant's indemnification request, and appellant commenced this action seeking indemnification pursuant to Minn.Stat. § 302A.521 (2006) and the terms of the parties' separation and release agreement. The jury returned a verdict in appellant's favor. The court of appeals reversed appellant's indemnification award, concluding that the district court erred in denying respondents' motion for summary judgment because appellant's conviction and sworn admissions conclusively established that he did not act in good faith. *Augustine v. Arizant Inc.*, 735 N.W.2d 740, 744–46 (Minn.App.2007). We reverse the decision of the court of appeals and remand for further proceedings.

Appellant is an anesthesiologist and inventor who founded respondent Augustine Medical, Inc., in 1987 and served as the company's CEO and chairman of the board.[1] He invented a product known as "Warm–Up Active Wound Therapy" for the treatment of chronic wounds. Because Warm–Up is typically administered in nursing homes, outpatient rehabilitation facilities, and home healthcare settings, all of which are heavily dependent on Medi-

---

1. Respondents Augustine Medical, Inc., and Arizant Healthcare, Inc., became wholly-owned subsidiaries of respondent Arizant, Inc., as part of a January 2003 corporate reorganization.

care reimbursement, Augustine Medical considered Warm–Up's eligibility for Medicare coverage to be an important issue. Appellant testified that the initial determination regarding whether a claim will be reimbursed by Medicare is made by a "fiscal intermediary," a private insurance company that contracts with Medicare to handle claims for a particular region. According to appellant, a reimbursement claim for an item may be submitted even if a fiscal intermediary has denied coverage, and such claims are often paid on appeal. Augustine Medical received advice regarding Medicare reimbursement for Warm–Up from director of reimbursement Paul Johnson, in-house counsel Randy Benham, outside Medicare consultant Phillip Zarlengo, and the law firms of Oppenheimer Wolff & Donnelly LLP and Vinson & Elkins LLP.

In November 1999, Augustine Medical learned that TriSpan Health Services, a fiscal intermediary, had determined that Warm–Up would not be reimbursed by Medicare. Appellant and other Augustine Medical representatives made a Warm–Up presentation to TriSpan in January 2000, and TriSpan subsequently reversed field and notified Augustine Medical that Warm–Up would be reimbursed by Medicare. But, on June 27, 2000, appellant received a letter from TriSpan that read as follows: "After careful review of your submitted brochures and monographs and a literature review, we have decided that the 'Warm–Up' therapy is investigational at this time. We will review the topic as additional studies warrant." Appellant understood the term "investigational" to refer to devices that have not been approved for marketing by the Food and Drug Administration (FDA). Because the FDA had approved the marketing of Warm–Up in 1997, appellant and others at Augustine Medical were confused by the TriSpan letter.

In e-mails to his colleagues at Augustine Medical, Paul Johnson explained that the TriSpan "letter is a total about face from every verbal communication I have had with three different TriSpan representatives" and that the "letter strongly implies TriSpan will not cover Warm–Up therapy." Appellant testified that "eventually, we just decided that [the letter] was wrong, and we shouldn't hand it out." According to appellant, "We were billing Medicare claim by claim before the letter. And when we didn't get coverage, we were billing Medicare claim by claim after the letter. So I didn't see [that] it had any [e]ffect on the rules."

Augustine Medical personnel learned in July 2000 that Tri–Span had denied reimbursement claims for Warm–Up. In an e-mail to appellant and others at Augustine Medical, Randy Benham cautioned "that we should not assume that TriSpan has decided *not* to reimburse for Warm–Up. Let's begin with the assumption that [the author of the TriSpan letter] merely informed us that TriSpan has refused to issue a local rule *mandating* reimbursement." Benham testified, however, that he advised the company that customers known to be billing TriSpan should be notified that TriSpan was denying reimbursement claims for Warm–Up.

Southern Medical Distributors, which was part of a government "sting" operation created to uncover Medicare fraud, had ordered Warm–Up from Augustine Medical. Tim Hensley, Augustine Medical's national sales manager, met with representatives of Southern Medical in Atlanta on August 16, 2000, but he did not disclose the TriSpan letter. In a telephone conversation 5 days later, Hensley told a Southern Medical representative that Augustine Medical did not have anything in writing from TriSpan. Appellant

testified that he also spoke with Southern Medical on several occasions and that, when Southern Medical asked him about TriSpan, he explained that TriSpan had denied coverage for Warm–Up. Indeed, in a telephone conversation with a Southern Medical representative on January 22, 2001, appellant stated that TriSpan had deemed Warm–Up investigational and had decided not to cover the product. Appellant reiterated to Southern Medical on March 1 that TriSpan had denied coverage for Warm–Up.

Appellant's relationship with other members of the board of directors soured, and he resigned as an employee of the company on December 31, 2002. In 2003, appellant, Paul Johnson, Randy Benham, Tim Hensley, Phillip Zarlengo, Arizant, and Augustine Medical were indicted for the felonies of conspiracy to defraud the United States, healthcare fraud, and mail fraud in connection with obtaining Medicare reimbursement for Warm–Up. Augustine Medical pleaded guilty to the felony of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (2000) and was ordered to pay a criminal fine exceeding $5 million and a civil fine exceeding $7 million. Appellant's trial was expected to last 3 to 4 months, but about 7 weeks into trial the government offered to dismiss the felony charges against appellant if he would plead guilty to a misdemeanor.[2] On June 29, 2004, appellant pleaded guilty to "knowingly and willfully aid[ing] and abett[ing] others in causing to be withheld from Southern Medical Distributors a material fact for use in determining rights to benefits and payments under * * * the Medicare program" in violation of 42 U.S.C. § 1320a–7b(a)(2)[3] and 18 U.S.C. § 2.[4] Relevant to these proceedings, Paul Johnson, Randy Benham, and Tim Hensley also pleaded guilty to 42 U.S.C. § 1320a–7b(a)(2) violations, and Phillip Zarlengo pleaded guilty to the felony of healthcare fraud in violation of 18 U.S.C. § 1347 (2000).

Appellant stipulated to the following facts as the basis for his guilty plea:

1. The Defendant was CEO of Augustine Medical, Inc. ("AMI"), a Minnesota corporation that manufactured and sold Warm–Up Active Wound Therapy ("Warm–Up").

2. The Defendant knew that claims for WarmUp were periodically submitted by others for reimbursement to the Medicare program, a Federal health care program.

3. On or about June 27, 2000, Defendant Scott D. Augustine received a letter from TriSpan Health Services, a fiscal intermediary of the Medicare program which had earlier approved coverage for WarmUp. TriSpan had now determined that WarmUp was in-

---

2. Appellant testified at trial that the government "worked with our lawyers to craft a new misdemeanor" to which he would plead guilty. Appellant had not been charged with the misdemeanor to which he pleaded guilty, and the indictment does not specifically allege that appellant participated in the decision not to disclose the TriSpan letter to Southern Medical Distributors.

3. 42 U.S.C. § 1320a–7b(a)(2) makes it a crime to "at any time knowingly and willfully make[ ] or cause[ ] to be made any false statement or representation of a material fact for use in determining rights to [any benefit or payment under a federal health care program]."

4. 18 U.S.C. § 2 reads as follows:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

vestigational. Defendant believed that this determination was material.

4. Shortly thereafter, the Defendant knowingly and intentionally aided and abetted others in deciding not to disclose the June 27th letter to Southern Medical Distributors.

5. By entering into this Stipulation of Facts, the Defendant admits that the facts set forth herein establish that he knowingly and intentionally aided and abetted the offense 42 U.S.C. Section 1320a–7b(a)(2) as set forth in an Information filed herewith and is in fact guilty of that offense.

Appellant was sentenced to a 3–year probationary term and ordered to pay a $2 million fine.[5] As a result of his conviction, appellant was excluded from participating in the Medicare program for a period of 5 years.

When appellant resigned as an employee of Augustine Medical, he and the company entered into a separation and release agreement, which contained the following indemnification provision:

> The Company agrees to indemnify and hold Dr. Augustine harmless from and against all attorney's fees, costs, disbursements and damages that he may incur as a result of and relating to any act or omission that he allegedly committed while serving as an officer, director and/or employee of the Company to the extent, and subject to the exceptions, that Minnesota law provides.

The separation and release agreement also provided that appellant was eligible to receive phantom stock payments based on increases in the fair market value of the company's common stock.

In July 2004, appellant requested indemnification for his fine and for his attorney fees incurred in connection with defending against the federal criminal charges to the extent not previously reimbursed. Respondent Arizant denied appellant's request for indemnification, claiming that appellant had not satisfied the requirements for mandatory indemnification under Minnesota law. Appellant sued respondents Augustine Medical, Arizant, and Arizant Healthcare in Hennepin County District Court, seeking indemnification for his fine, unpaid legal fees, and expenses pursuant to Minn.Stat. § 302A.521 and the terms of the parties' separation and release agreement and damages caused by respondents' breach of the phantom stock provision in the separation and release agreement.

Appellant and respondents filed motions for partial summary judgment on the issue of indemnification, which the district court denied. The case then went to trial, and the jury found that appellant was entitled to indemnification from respondents in the amount of $2,278,025, that respondents breached the parties' separation and release agreement in determining the fair market value of the company's stock, and that appellant should receive phantom stock bonuses of $539,852.50 and $697,999.25 for the years 2006 and 2007, respectively. The district court entered judgment in appellant's favor, ordering that he recover $3,515,876.70 from respondents, as well as interest and attorney fees. The court of appeals reversed the district court's awards of indemnification and attorney fees, however, ruling that the district court erred in denying respondents' motion for partial summary judgment. *Augustine*, 735 N.W.2d at 744–46.

---

**5.** In contrast to appellant's $2 million fine, Paul Johnson, Randy Benham, and Tim Hens-ley were fined $100,000 each.

The court of appeals concluded that appellant's claim for indemnification failed as a matter of law because his conviction under 42 U.S.C. § 1320a–7b(a)(2) and his "sworn admission that he acted with fraudulent intent * * * conclusively establish that he did not act in good faith." *Augustine*, 735 N.W.2d at 744–45. The court of appeals also ruled that the district court properly submitted appellant's breach of contract claim to the jury. *Id.* at 745–46.

## I.

■ The issue presented in this case is whether the district court erred in denying respondents' motion for partial summary judgment. Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. "In reviewing an appeal from the denial of summary judgment, we must determine whether there are genuine issues of material fact and whether the district court erred in applying the law," and "we must consider the evidence in the light most favorable to the nonmoving party." *Mumm v. Mornson*, 708 N.W.2d 475, 481 (Minn.2006).

Under Minn.Stat. § 302A.521, subd. 2(a), respondents are required to indemnify appellant if appellant (1) "has not been indemnified by another organization or employee benefit plan," (2) "acted in good faith," (3) "received no improper personal benefit," (4) "had no reasonable cause to believe the conduct was unlawful," and (5)

"reasonably believed that the conduct was in the best interests of the corporation." Minnesota Statutes § 302A.521, subd. 2(b), provides that "[t]he termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent does not, of itself, establish that the person did not meet the criteria set forth in this subdivision."

■ The crux of the dispute presented here is whether appellant failed, as a matter of law, to satisfy the good faith requirement of Minn.Stat. § 302A.521, subd. 2(a). " 'Good faith' means honesty in fact in the conduct of the act or transaction concerned." Minn.Stat. § 302A.011, subd. 13 (2006). As we stated in another context, the "[d]etermination of what constitutes good faith necessarily involves factual findings. It is for the trier of fact to evaluate the credibility of a claim of 'honesty in fact' and, in doing so, to take account of the reasonableness or unreasonableness of the claim." *Tonka Tours, Inc. v. Chadima*, 372 N.W.2d 723, 728 (Minn.1985) (internal citation omitted).

We conclude that genuine issues of material fact existed as to whether appellant acted in good faith. We begin with the observation that under Minn.Stat. § 302A.521, subd. 2(b), which was not cited by the court of appeals, appellant's guilty plea "does not, of itself, establish that" he failed to act in good faith. Assuming without deciding that it is appropriate to consider appellant's stipulation and his testimony at his change of plea hearing, appellant's admissions contained therein do not support the result reached by the court of appeals.[6] Appellant, in

---

6. It is not necessary to decide here, and we do not decide, whether sworn admissions made in connection with a guilty plea are encompassed within the rule of Minn.Stat. § 302A.521, subd. 2(b), that a guilty plea does not, of itself, establish that a person did not

meet the requirements of the indemnification statute. *See* Minn. R.Crim. P. 15.01, subd. 1(20) (requiring the court, before a guilty plea is accepted in a felony or gross misdemeanor case, to question the defendant under oath as to the factual basis for the plea); Minn.

entering his plea, did little more than massage the language of the statute. He admitted that he "knowingly and intentionally aided and abetted the offense of 42 U.S.C., Section 1320a–7b(a)(2), by causing to be withheld from Southern Medical Distributors a material fact for use in determining rights to benefits and payments under the Medicare program." He also acknowledged that he considered the contents of the TriSpan letter to be material and that shortly after receiving the TriSpan letter he "intentionally and knowingly aided and abetted others in deciding not to disclose that letter * * * to providers." It is worth noting that in neither his stipulation nor in his testimony at the change of plea hearing did appellant admit that he failed to act in good faith.

Not only do appellant's admissions made in connection with his plea agreement fail to demonstrate a lack of good faith, but the circumstances surrounding his plea are also less than persuasive as to respondents' claim that appellant did not act in good faith. The federal government set up an elaborate Medicare "sting" operation. Appellant, along with other employees of the corporation and the corporation itself, was charged with multiple serious felonies. The corporation pleaded guilty to a felony, but after many weeks of trial, the United States offered to dismiss appellant's felony charges in exchange for a misdemeanor plea. Defendants plead guilty for many reasons—to avoid a felony conviction, to cap otherwise ruinous attorney fees, and to eliminate lengthy trial proceedings. All of these motivations, at the very least, were potentially in play here.

The problems with respondents' argument do not end with the plea itself, for subsequent to entering his guilty plea, appellant denied acting in bad faith. In his affidavit submitted in opposition to respondents' motion for partial summary judgment, appellant claimed that "[b]ecause all of my actions regarding Warm–Up were made in good faith, I have never admitted that I did not act in good faith." He explained that the decision not to disclose the TriSpan letter to Southern Medical was made jointly by himself and others at Augustine Medical, and that "[a]t the time that we made the decision, I had no intent to be dishonest or mislead anyone. The decision was made in good faith, because the letter appeared to be inaccurate, it was confusing, and it did not state whether TriSpan intended to cover Warm–Up or not."

Finally, we turn to the claim of respondents that a party resisting summary judgment is not permitted to simply deny that which was previously asserted. We do not retreat from our prior statement that "affidavits that contradict earlier deposition testimony generally may not be used to create a genuine issue of fact," *Hoover v. Norwest Private Mortgage Banking*, 632 N.W.2d 534, 541 n. 4 (Minn.2001), but those are not the facts of this case. Appellant has never disputed his guilty plea and has, in fact, reaffirmed it; but he has also stated that he acted in good faith, and his sworn admissions related to a guilty plea entered into under highly unusual circumstances. Particularly when the evidence is viewed in appellant's favor, genuine issues of material fact existed as to whether appellant acted in good faith.[7]

R.Crim. P. 15.02(7) (requiring the court, before a guilty plea is accepted in a misdemeanor case, to "elicit sufficient facts from the defendant to determine whether there is a factual basis for all elements of the offense to which the defendant is pleading guilty").

7. None of the other elements of Minn.Stat. § 302A.521, subd. 2(a), provide a basis on

We conclude that genuine issues of material fact existed under the unique circumstances of this case. Appellant's guilty plea to aiding and abetting a violation of 42 U.S.C. § 1320a–7b(a)(2) and his related admissions do not establish, as a matter of law, that he did not act in good faith for purposes of indemnification under Minn. Stat. § 302A.521, subd. 2(a). Accordingly, we hold that the district court did not err in denying respondents' motion for partial summary judgment, and we reverse the decision of the court of appeals and remand for further proceedings.

Reversed and remanded.

MAGNUSON, C.J., and DIETZEN, J., not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

which summary judgment could be granted in respondents' favor. There is no evidence that appellant has received indemnification from any other source as to the fine and expenses for which he seeks reimbursement or that he has received any improper personal benefit. Furthermore, he testified at trial that he was not aware that his actions were illegal and stated in his affidavit submitted in opposition to respondents' motion for partial summary judgment that he had no reason to believe his conduct was illegal. Finally, appellant testified at trial that he had believed he was acting in the company's best interests with respect to the TriSpan letter, and, in his affidavit submitted in support of his motion for partial summary judgment, he explained that he feared that disclosing the letter would improperly deter potential customers from using Warm–Up.