Gregory CURTIS, et al., individually and on behalf of all others similarly situated, Appellants,

v.

ALTRIA GROUP, INC., Respondent,

Philip Morris, Inc., Respondent.

No. A10–215.

Court of Appeals of Minnesota.

Dec. 28, 2010.

Kay Nord Hunt, Ehrich L. Koch, Valerie Sims, Lommen, Abdo, Cole, King & Stageberg, P.A., Minneapolis, MN; and Stephen A. Sheller, Sheller, P.C., Philadelphia, PA; and Martha K. Wivell, Sheller, P.C., Cook, MN; and Esther E. Berezofsky, Williams, Cuker, Berezofsky, Cherry Hill, NJ, for appellants.

Guy Miller Struve, Justin Goodyear, Davis Polk & Wardwell, L.L.P., New York, NY; and William P. Studer, David P. Graham, Oppenheimer Wolff & Donnelly, L.L.P., Minneapolis, MN, for respondent Altria Group.

George W. Soule, Nathan J. Marcusen, Bowman and Brooke, L.L.P., Minneapolis, MN; and Mary Vasaly, Maslon Edelman Borman & Brand, L.L.P., Minneapolis, MN; and Gregory P. Stone, Randall G. Sommer, Munger, Tolles & Olson, L.L.P., Los Angeles, CA, for respondent Philip Morris.

Lori Swanson, Attorney General, Benjamin J. Velzen, Assistant Attorney General, St. Paul, MN, for amicus curiae State of Minnesota.

Prentiss Cox, Minneapolis, MN, for amicus curiae Tobacco Control Legal Consortium.

Charles A. Bird, Bird, Jacobsen & Stevens, P.C., Rochester, MN, for amicus curiae Minnesota Association for Justice.

Scott A. Smith, Nilan Johnson Lewis P.A., Minneapolis, MN; and John H. Beisner, Jessica Davidson Miller, Geoffrey M. Wyatt, Skadden, Arps, Slate, Meagher & Flom, L.L.P, Washington, D.C.; and Robin S. Conrad, Amar D. Sarwal, National Chamber Litigation Center, Inc., Washington, D.C., for amicus curiae Chamber of Commerce of the United States of America.

Considered and decided by STONEBURNER, Presiding Judge; KLAPHAKE, Judge; and WORKE, Judge.

## OPINION

STONEBURNER, Judge.

In 2001, appellants sued respondents Altria Group Inc. (Altria) (formerly Philip Morris Companies Inc.) and Philip Morris Incorporated (Philip Morris) under Minn. Stat. § 8.31, subd. 3a,[1] seeking damages and other relief, individually and on behalf of a class, alleging false advertising, consumer fraud, and deceptive trade practices regarding "light" cigarettes in violation of Minnesota consumer-protection statutes. The complaint also asserted claims of common-law fraud and unjust enrichment.

Appellants define the class as "[a]ll persons who purchased Marlboro Lights cigarettes in Minnesota for personal consumption from the first date [respondents] sold Marlboro Lights in Minnesota [1972] through the date of the certification of the class." The complaint alleges that respondents "engaged in misrepresentations, unlawful schemes and courses of conduct intended to induce [appellants and class members] to purchase ... Marlboro Lights cigarettes in violation of Minnesota's law[s]" prohibiting consumer fraud, unlawful and deceptive trade practices, and false advertising, as well as common-law prohibitions against fraud and unjust

---

1. Throughout this opinion, the relevant statute, Minn.Stat. § 8.31, subd. 3a, is referenced as it relates to various stages of the litigation, which began in 2001. But because the language of subdivision 3a has not been altered or amended at any point during the instant case, the subdivision is cited herein without regard to which yearly version of statute is being discussed.

enrichment.[2] Altria's 2002 motion to dismiss appellants' claims for lack of personal jurisdiction was denied.

The district court initially denied class certification, but on reconsideration certified the class. The district court denied appellants' motion for partial summary judgment based on the application of collateral estoppel to prevent respondents from challenging findings of fact made in federal litigation concerning Philip Morris's violation of consumer-protection laws. The district court denied respondents' motion for partial summary judgment based on the statute of limitations.

The district court later granted partial summary judgment to respondents, dismissing appellants' cause of action under Minn.Stat. § 8.31, subd. 3a, for failure to confer a public benefit and, alternatively, as barred by the release in a prior settlement agreement between the state and respondents. The district court also granted respondents' motion to dismiss appellants' unjust-enrichment claim on the pleadings, concluding that because appellants have an adequate legal remedy, they are not, as a matter of law, entitled to equitable relief under an unjust-enrichment theory. In this appeal and related appeals, appellants and respondents challenge all of the rulings of the district court.

## FACTS

### Background

In the 1950s and 1960s, the public-health community began recommending the use of lower-tar cigarettes because of a reported link between tar and disease. In 1966, a confidential Philip Morris report examined the market potential of a "health cigarette." The report concluded, in part, that (1) smokers were concerned about the relationship of cigarette smoking to health; (2) "[t]he market share of health cigarettes increases rapidly for a brief period during each health scare and quickly stabilizes at a new and higher level of market penetration;" and (3) "[t]he illusion of filtration is as important as the fact of filtration ... [, t]herefore any entry should be by a radically different method of filtration but need not be any more effective." The report states that if Philip Morris "could develop a medically and governmentally endorsed 'healthy' cigarette that tasted exactly like a Marlboro, delivered the nicotine of a Marlboro, and was called Marlboro, it would probably become the best selling brand." But the report expressed doubt that the medical profession and the federal government would endorse any cigarette.

In 1967, the Federal Trade Commission (FTC) began using a machine to measure the amount of tar in a cigarette by "smoking" the cigarette using a standardized intensity, duration, and interval between puffs. Data from the FTC's machine showed that, under standardized smoking conditions, "light" cigarettes deliver lower levels of tar than regular cigarettes. Philip Morris advised the FTC that the machine does not replicate human smoking behaviors, which could limit the practical value of test data, but the FTC continued to measure tar with the machine.

In 1971, Philip Morris began manufacturing and marketing Marlboro Lights (Lights). Throughout the 1970s, 1980s, and 1990s, Lights were marketed as having less tar and nicotine than regular Marlboro cigarettes. And the public-health community encouraged the use of

**2.** Appellants later stipulated to a dismissal of their common-law claim of fraud and demand for injunctive relief.

low-tar, low-nicotine cigarettes, based in part, on a 1976 American Cancer Society study that found that smokers who smoked low-tar cigarettes were approximately 25% less likely to die from lung cancer than smokers of traditional cigarettes.

In *State by Humphrey v. Philip Morris USA, Inc.*, which settled in 1998, the Minnesota Attorney General sought damages and injunctive relief on behalf of the state for the increased cost of medical care caused by smoking. No. C1–94–8565 (Minn.Dist.Ct. May 8, 1998). Discovery in that case resulted in the disclosure of internal tobacco-industry documents that had previously been confidential. The settlement (Tobacco Settlement) resulted in billions of dollars in damages being paid to the state, broad injunctive relief controlling various forms of advertising and marketing, and the attorney general being given ongoing power to prevent Philip Morris from engaging in future misrepresentations.

In 2001, the National Cancer Institute reconsidered existing data relating to smoking and health and published "Monograph 13," which stated that "no convincing evidence" exists to show any "important decrease" in disease risks from smoking low-tar, low-nicotine cigarettes. The Monograph 13 authors based their conclusions on formerly confidential internal industry documents that, according to Monograph 13, show "[t]hat the tobacco companies set out to develop cigarette designs that markedly lowered the tar and nicotine yield results as measured by the [FTC] testing method. Yet, these cigarettes can be manipulated by the smoker to increase the intake of tar and nicotine."

**Complaint**

After the publication of Monograph 13, appellants sued Altria[3] and Philip Morris

under Minn.Stat. § 8.31, subd. 3a, which provides a cause of action for damages and other relief for injury due to violation of Minnesota's consumer-protection laws. Appellants sought to represent a class consisting of "[a]ll persons who purchased Marlboro Lights cigarettes in Minnesota for personal consumption from the first date [respondents] sold Marlboro Lights in Minnesota [1972] through the date of the certification of the class."

The complaint asserts that respondents "engaged in misrepresentations, unlawful schemes and courses of conduct intended to induce [appellants and class members] to purchase ... [Lights] in violation of Minnesota's laws" prohibiting consumer fraud, unlawful and deceptive trade practices, and false advertising, as well as common-law prohibitions against fraud and unjust enrichment. Appellants initially sought injunctive relief, restitution of the purchase price for all Lights purchased by class members during the relevant period, disgorgement of respondents' profits from the deceptive sale of Lights to class members, attorney fees, interest and costs. During the lengthy course of this litigation, appellants stipulated to dismissal of their common-law claim of fraud and the remedy of injunctive relief. Currently, appellants seek damages only in the form of disgorgement of profits, restitution, attorney fees, interest, and costs.

**History of litigation**

In 2002, the district court denied Altria's motion to dismiss the complaint against Altria for lack of personal jurisdiction. In January 2004, the district court denied appellants' motion for class certification, concluding that "[i]ndividual issues of law and fact predominate over common ones ... necessitat[ing] individual inquiries into each class member's reasons for smoking

---

**3.** Altria is a holding company that was formed in 1985. Altria owns Philip Morris.

[Lights], as well as an inquiry into whether the manner in which they smoked [Lights] caused them to receive less, the same, or more tar and nicotine than they would have gotten from regular cigarettes."

The district court granted appellants' request for reconsideration of class certification and, in November 2004, reversed itself and certified the class. On reconsideration, the district court stated that, because the injury claimed is economic and not physical, all class members have been similarly injured by the alleged conduct of respondents. After considering the possibility of delay and the high cost of litigation, the district court found that class certification is "pragmatically, the only method whereby purchasers of Marlboro Lights in Minnesota can seek redress for the alleged deception."

In March 2009, appellants moved for partial summary judgment based on collateral estoppel. Appellants sought to apply certain findings of fact from *United States v. Philip Morris USA Inc.*, 449 F.Supp.2d 1 (D.D.C.2006) (*DOJ* ), *aff'd in part, vacated in part,* 566 F.3d 1095 (D.C.Cir.2009), to summarily establish that Philip Morris represented that Lights contain lower tar and nicotine in relation to other cigarettes while knowing these statements to be false. The district court declined to exercise its discretion to apply non-mutual offensive collateral estoppel and, therefore, denied appellants' motion for partial summary judgment.

In June 2009, Congress passed the Family Smoking Prevention and Tobacco Control Act, Pub.L. No. 111–31, § 101(b)(3), 123 Stat. 1776, 1812 (2009). The act bans marketing of tobacco products using descriptors such as "light" and "low tar."

In October 2009, the district court denied respondents' motion for partial summary judgment based on the statute of limitations, but dismissed appellants' claims under Minn.Stat. § 8.31, subd. 3a, concluding that the prior lawsuit by the state and the enactment of federal legislation precluded appellants from being able to meet the public-benefit element required to bring such an action. The district court held, in the alternative, that appellants' claims under Minn.Stat. § 8.31, subd. 3a, are barred by the release contained in the Tobacco Settlement. Subsequently, the district court granted judgment on the pleadings in favor of respondents, dismissing appellants' only remaining claim: unjust enrichment.

Appellants now challenge dismissal of their actions under Minn.Stat. § 8.31, subd. 3a. Appellants also seek reinstatement of their unjust-enrichment claim and challenge denial of their motion that sought to establish facts through collateral estoppel.

Respondents, in related appeals, challenge class certification and denial of the motion to limit appellants' claims based on the statute of limitations. Altria challenges denial of its motion to dismiss for lack of personal jurisdiction.

## ISSUES

I. Did the district court err in determining that Altria is subject to personal jurisdiction in Minnesota?

II. Did the district court err in summarily dismissing appellants' claims under Minn.Stat. § 8.31, subd. 3a?

III. Did the district court err in dismissing appellants' unjust-enrichment claim?

IV. Did the district court abuse its discretion in denying appellants' motion for partial summary judgment based on collateral estoppel?

V. Did the district court abuse its discretion in certifying the class?

VI. Did the district court err in denying Philip Morris's motion for partial summary judgment based on the statute of limitations?

## ANALYSIS

### I. Personal jurisdiction over Altria

#### A. Standard of review

 Altria argues that the district court erred in denying its motion to dismiss for lack of personal jurisdiction. Altria argues that it is a legal entity that is separate and distinct from Philip Morris and that appellants have failed to demonstrate a legal basis for Minnesota's assertion of personal jurisdiction over Altria. Whether personal jurisdiction exists is a question of law, reviewed de novo. *Juelich v. Yamazaki Mazak Optonics Corp.*, 682 N.W.2d 565, 569 (Minn.2004). Any doubts should be resolved in favor of retaining jurisdiction. *Nw. Airlines, Inc. v. Friday*, 617 N.W.2d 590, 592 (Minn.App. 2000).

 When a defendant challenges jurisdiction, the burden of proof to demonstrate jurisdiction is on the plaintiff. *Dent–Air, Inc. v. Beech Mountain Air Serv.*, 332 N.W.2d 904, 907 n. 1 (Minn.1983). And the plaintiff cannot rely on general statements in the pleadings to sustain that burden when the defendant's motion to dismiss is supported by affidavits. *Sausser v. Republic Mortg. Investors*, 269 N.W.2d 758, 761 (Minn.1978).

#### B. Due process

 Minnesota's long-arm statute provides that

> a court of this state with jurisdiction of the subject matter may exercise personal jurisdiction over any foreign corporation ... if, in person or though an agent, the foreign corporation ... (2) transacts any business with the state; or (3) commits any act in Minnesota causing injury or property damage; or (4) commits any act outside Minnesota causing injury or property damage in Minnesota.

Minn.Stat. § 543.19, subd. 1 (2008). "[The supreme court] has repeatedly held that the legislature designed the long-arm statute to extend the personal jurisdiction of Minnesota courts as far as the Due Process clause of the federal constitution allows." *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 410 (Minn.1992) (stating that "when analyzing most personal jurisdiction questions, Minnesota courts may simply apply the federal case law," *id.* at 411).

The polestar of modern personal jurisdiction analysis is *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In *International Shoe*, the Supreme Court held that state courts may constitutionally exercise personal jurisdiction over nonresident defendants who have "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at 316, 66 S.Ct. at 158 (citations omitted).

*Id.* at 411. To satisfy a minimum-contacts analysis, the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum" state and be able to "reasonably anticipate" the exercise of personal jurisdiction by the state. *Marshall v. Inn on Madeline Island*, 610 N.W.2d 670, 674 (Minn. App.2000) (quotation omitted). To determine if minimum contacts exist, Minnesota courts evaluate five factors:

(1) the quantity of contacts with the forum state,

(2) the nature and quality of contacts,

(3) the source and connection of the cause of action with these contacts,

(4) the interest of the state in providing a forum, [and]

(5) the convenience of the parties.

*Rostad v. On–Deck, Inc.,* 372 N.W.2d 717, 719–20 (Minn.1985) *cert. denied,* 474 U.S. 1006, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985). The last two factors are less important than the first three. *Id.* at 720.

 Personal jurisdiction can be "general" or "specific." *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). General personal jurisdiction is satisfied when a defendant conducts continuous and systematic business within a state such that the state can properly assert jurisdiction over the defendant for *any* purpose within the constraints of traditional notions of fair play and substantial justice. *Id.* "Specific [personal] jurisdiction can arise from a single contact with the forum if the cause of action arose out of that contact." *Marshall,* 610 N.W.2d at 674.

It is not disputed that the general conduct of Philip Morris in Minnesota subjects Philip Morris to personal jurisdiction in Minnesota. In this case, the district court did not base jurisdiction over Altria on specific or general conduct of Altria in Minnesota. Instead, the district court found that Altria exercises extensive control over Philip Morris, subjecting Altria to vicarious personal jurisdiction for the general conduct of Philip Morris in Minnesota.

## C. Vicarious personal jurisdiction

 A nonresident corporation may be subject to jurisdiction in a state by virtue of its subsidiary's activities in that state if the companies are organized and operated so that the subsidiary is an instrumentality or alter ego of the parent. *Zimmerman v. Am. Inter–Ins. Exch.,* 386 N.W.2d 825, 828 (Minn.App.1986) (citing *Scott v. Mego Int'l, Inc.,* 519 F.Supp. 1118,

1126 (D.Minn.1981)), *review denied* (Minn. July 31, 1986). Appellants assert that the record supports the district court's finding that Altria exercises "total control [over] and day-to-day interference" with its wholly owned subsidiary, Philip Morris. We disagree and conclude that the district court's finding is clearly erroneous.

This court recently addressed the issue of vicarious personal jurisdiction over a nonresident parent company based on control of its subsidiary in *JL Schwieters Const., Inc. v. Goldridge Const., Inc.,* 788 N.W.2d 529 (Minn.App.2010). In *JL Schwieters,* we relied in part on *Scott,* to conclude that there was sufficient evidence to support an inference that defendant parent corporation operated its involved subsidiary as its alter ego in Minnesota, thereby warranting vicarious personal jurisdiction over the parent corporation. *Id.* at 536–37. But several factors distinguish the relationship between Altria and Philip Morris from the relationships between the parent companies and subsidiaries in *JL Schwieters* and *Scott.*

In *Scott,* the factors found to be significant in determining that a subsidiary corporation was the mere instrumentality of its parent were (1) the parent maintained offices at the same location as the subsidiary; (2) the same two people were the directors of both corporations; (3) a number of the same people were officers of both corporations; (4) the corporations issued consolidated summaries of operations, financial statements, statements of income, statements of changes in financial position, and statements of shareholders' equity; (5) the parent and its subsidiaries filed consolidated federal income tax returns; and (6) the parent guaranteed the credit facility of its domestic subsidiaries and funded their pension plans. 519 F.Supp. at 1126.

Similarly, in *Schwieters,* a mechanic's-lien action in which the subcontractor sued the corporate owner of the property and its parent holding company, the parent and subsidiary shared the same address and had the same principals. 788 N.W.2d at 537. The district court's denial of the parent company's motion to dismiss for lack of personal jurisdiction was affirmed by this court based on evidence that the parent company completely controlled the subsidiary and operated the subsidiary for purposes of the parent company. *Id.* at 536. We held that "under the facts as alleged at this stage of the litigation, [property owning subsidiary] operated as [parent company's] Minnesota alter ego, supporting the district court's exercise of vicarious personal jurisdiction over [parent company]." *Id.*

Altria did not exist until 1985, when it was created as a holding company to own Philip Morris and other corporations. The district court found that before 1985, Altria and Philip Morris "were one and the same." But we agree with Altria that this is not a legally accurate finding. Altria is not a successor to Philip Morris, which continues to exist as a separate corporation. Altria is a separate corporation that did not exist before 1985; therefore, there is no factual or legal basis to find that the corporations were "one and the same" before Altria's existence.

Initially, Altria and Philip Morris had identical board members, but Altria's evidence demonstrates that shortly after Altria's inception, Philip Morris's board members made up less than one-fourth of the Altria board until 1991. By 2001, when this action started, Altria and Philip Morris did not have any common officers or directors. This court has not been directed to any evidence in the record demonstrating that Altria has ever maintained a physical presence in Minnesota or that Altria and Philip Morris are operated from the same office.

■ Caselaw recognizes that ordinary supervision of a subsidiary by a parent corporation is not sufficient to extend personal jurisdiction over the subsidiary to the parent. *See Seltzer v. I.C. Optics, Ltd.,* 339 F.Supp.2d 601, 611 (D.N.J.2004) (finding lack of personal jurisdiction over parent, despite allegations that parent exerted a considerable amount of influence and control over the subsidiary, because the parent's "activities did not deviate from the normal amount of control a parent has over its subsidiary").

The only evidence that appellants have cited of Altria's control over Philip Morris is Geoffrey C. Bible's concession during testimony in the 1998 state litigation that, as CEO of Altria, he has the power to make a decision about what Philip Morris will say regarding smoking and health. But this statement is not evidence that Altria exercises, or has ever exercised, such power over Philip Morris. There is no evidence in the record that Altria is or ever has been involved in day-to-day control over production or distribution of Philip Morris's products. *See United States v. Advance Mach. Co.,* 547 F.Supp. 1085, 1093–94 (D.Minn.1982) (stating that "[t]he strongest evidence of the independence of [a subsidiary] was its degree of autonomy in the day-to-day production and distribution of [its product] and its financial strength").

On appeal, appellants assert four additional arguments to support personal jurisdiction over Altria: (1) Altria's supporting affidavits lack credibility; (2) the stream-of-commerce doctrine supports jurisdiction; (3) the parent-subsidiary relationship itself is a basis of minimum-contacts jurisdiction; and (4) an agency theory supports a finding of jurisdiction. But the district court did not find that Altria's affidavits

lack credibility, and the other arguments were not briefed or decided in the district court, and are only minimally briefed in this court. We therefore decline to address these four arguments on appeal. *See State, Dep't of Labor and Indus. v. Wintz Parcel Drivers, Inc.*, 558 N.W.2d 480, 480 (Minn.1997) (stating that the court declines to reach an issue in the absence of adequate briefing); *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988) (stating that a reviewing court will generally not consider matters not argued to and considered by the district court).

On this record, we conclude that appellants have not established that Altria operated Philip Morris as its Minnesota alter ego such that Minnesota has vicarious personal jurisdiction over Altria. Therefore, we hold that the district court erred by denying Altria's motion to dismiss for lack of personal jurisdiction. Because Altria is not a proper party to this lawsuit, we refer only to Phillip Morris in the remainder of this opinion.

## II. Dismissal of claims under Minn. Stat. § 8.31, subd. 3a

### A. Standard of review

■ The district court summarily dismissed appellants' claims under Minn.Stat. § 8.31, subd. 3a, primarily based on its conclusion that appellants failed to satisfy the "public benefit" element of an action under this statute. "When the district court grants summary judgment based on the application of a statute to undisputed facts, the result is a legal conclusion that we review de novo." *Weston v. McWilliams & Assocs.*, 716 N.W.2d 634, 638 (Minn.2006).

The district court held in the alternative that even if appellants' claims provide a public benefit, they are nonetheless barred by the Tobacco Settlement release, which precludes further action by or on behalf of the state. A settlement agreement is a contract, and contract interpretation is reviewed de novo. *State by Humphrey v. Philip Morris USA, Inc.*, 713 N.W.2d 350, 355 (Minn.2006). "Unambiguous language in the settlement agreement is to be given its plain and ordinary meaning." *Id.*

### B. Public-benefit requirement

■ Appellants' claims under Minn. Stat. § 8.31, subd. 3a, allege violations of the following consumer-protection statutes: (1) the Minnesota Prevention of Consumer Fraud Act (CFA), Minn.Stat. §§ 325F.68–.70 (2008); (2) the Minnesota Unlawful Trade Practices Act (UTPA), Minn.Stat. §§ 325D.09–.16 (2008); (3) the Minnesota Uniform Deceptive Trade Practices Act (DTPA), Minn.Stat. §§ 325D.43–.48 (2008); and (4) the Minnesota False Statement in Advertisement Act (FSAA), Minn.Stat. §§ 325F.67 (2008). Appellants seek compensatory damages for injury caused by the alleged violations.

Minn.Stat. § 8.31, subd. 3a, frequently referred to as the "private attorney general statute," provides that

> any person injured by a violation of [the above-listed consumer-protection laws] may bring a civil action and recover damages, together with costs and disbursements including ... reasonable attorney's fees, and receive other equitable relief as determined by the court.

In *Ly v. Nystrom*, the supreme court addressed the issue of whether an individual victim of common-law fraud in the private sale of a restaurant has a cause of action for a violation of the CFA under Minn.Stat. § 8.31, subd. 3a. 615 N.W.2d 302, 307, 311 (Minn.2000). The supreme court concluded that, although the unlawful practices alleged by the victim fell within the practices prohibited by the CFA, the scope of the private-remedies provision in Minn.Stat. § 8.31, subd. 3a, is limited to actions that protect *public* rights such that

"public interest must be demonstrated to state a claim under [Minn.Stat. § 8.31, subd. 3a]." *Id.* at 313–14. The supreme court held that Minn.Stat. § 8.31, subd. 3a, "applies only to those claimants who demonstrate that their cause of action benefits the public." *Id.* at 314.[4]

In *Collins v. Minn. Sch. of Bus.*, the supreme court considered whether the claims of eighteen former students of the Minnesota School of Business (MSB), brought under Minn.Stat. § 8.31, subd. 3a, "benefitted the public as required by *Ly v. Nystrom.*" 655 N.W.2d 320 (Minn.2003). The supreme court stated that by dismissing the students' claims because "only a relatively small group of persons were injured by MSB's fraudulent activities[,] ... [the district court] misapplied the holding in *Nystrom* by ignoring the fact that MSB *misrepresented the nature of its program to the public at large.*" *Id.* at 330 (emphasis added). The supreme court held that the students' successful prosecution of their claims benefited the public, entitling them to reasonable attorney fees under Minn.Stat. § 8.31, subd. 3a. *Id.*

Appellants' claims against Philip Morris involve allegedly fraudulent representations made to the public at large over a long period of time, affecting hundreds of thousands of consumers in Minnesota. To the extent that *Nystrom* and *Collins* define what constitutes a public benefit, appellants plainly have established that their claims provide such benefit.

**C. Effect of attorney general's litigation against Philip Morris on public-benefit element of appellants' action under Minn.Stat. § 8.31, subd. 3a**

■ The district court concluded that appellants cannot meet the public-benefit element of Minn.Stat. § 8.31, subd. 3a, because the action by the attorney general against Philip Morris, which asserted the same violations of law asserted by appellants, has already conferred any public benefit that could result from appellants' action.

The district court relied on an unpublished opinion of this court and an unpublished opinion from the Minnesota federal district court for the proposition that once an attorney general's action has benefitted the public by obtaining a permanent injunction against future harmful conduct, a subsequent private action based on the same conduct cannot benefit the public. *See Weigand v. Walser Auto. Grp., Inc.*, No. A05–1911, 2006 WL 1529511, at *4 (Minn.App. June 6, 2006) (concluding that prior settlement agreement between a car dealership and the state attorney general precluded customers' post-settlement claims); *Simonson v. Ameriquest Mortg. Co.*, Civil No. 06–2943, 2006 WL 3463000, (D.Minn. Nov. 30, 2006) (finding that a settlement reached between a mortgage company and the attorney general limits post-settlement lawsuits, which could only provide a "negligible additional public benefit"). But these opinions do not have any precedential effect, and the circumstances of each case are distinguishable from the instant case.

In *Weigand,* the attorney general's settlement agreement and consent order specifically provided a remedy for individual consumers claiming to have been injured by the complained-of practices. 2006 WL 1529511, at *3–4 (noting that the consent order provides a remedy for consumers affected by misrepresentations, including

---

4. Justice Page dissented, stating that "[h]ad the legislature intended to limit the scope of Minn.Stat. § 8.31, subdivision 3a, to those causes of action that have a public benefit, it could have easily done so ... [but] it did not." *Ly,* 615 N.W.2d at 315 (Page, J., dissenting).

an arbitration procedure that could be used to seek damages). In contrast, the Tobacco Settlement does not provide any remedy for individual consumers who claimed to have been injured by Philip Morris's violation of consumer-protection laws. Because of this distinction, we do not find the broadly-stated holding in *Weigand* persuasive in this case.

In *Simonson*, fraud claims were dismissed based on the statute of limitations and, alternatively, on the fact that the claims involved a single, one-on-one transaction. 2006 WL 3463000 at *4. The statement that the state attorneys general settlements with the defendant "suggest that [Simonson]'s lawsuit can confer only a negligible additional public benefit" is dictum. *Id.* Here, the Minnesota Attorney General has filed an amicus curiae brief that argues, in relevant part, that the release in the Tobacco Settlement does not preclude appellants' claims. The attorney general writes, "[t]his Office believes that Appellants' private action does provide an ancillary and/or residual benefit to the public regardless of the attorney general's earlier lawsuit against Respondents." And appellants cite the recent unpublished case of *In re Nat'l Arbitration Forum Trade Practices Litig.*, in which the Minnesota federal district court rejected the assertion that plaintiffs' claims for violation of Minnesota consumer-protection laws did not confer a public benefit because the attorney general had already sued to enforce the statutes and obtained a consent decree. 704 F.Supp.2d 832, 839 (D.Minn. 2010). The federal district court stated that

> the allegations in this case indicate that there may be a public benefit to Plaintiffs' lawsuit despite the Attorney General's consent decree. That consent decree merely required [defendant] to cease and desist its [challenged practices]. Thus, Plaintiffs' continued pur-

suit of monetary damages for the class against [defendant] has a public benefit.

*Id.*

In *Group Health Plan, Inc. v. Philip Morris, Inc.*, answering two questions certified to it by the federal district court, the Minnesota Supreme Court "determine[d] the scope of statutory claims for relief under [Minnesota consumer-protection laws], first, as to who may bring a claim and, second, as to the nature of the pleading and proof that is necessary to such a claim." 621 N.W.2d 2, 5 (Minn.2001). Justice Page, writing for the unanimous court, rejected defendants' argument that actions under Minn.Stat. § 8.31, subd. 3a, should be limited to consumers of the product claiming misrepresentation, stating that

> [o]ur unwillingness to limit the plain meaning conveyed by the language of subdivision 3a based on the presumed intent of the misrepresentation in sales statutes is fortified by the fact that the naturally broad interpretation of "any person" is consistent with the overall tenor of the statutes at issue to maximize the tools available to stop the prohibited conduct.

*Id.* at 9. We find this statement instructive, and we decline to further narrow a person's right to pursue an action under Minn. Stat. § 8.31, subd. 3a, by expanding restrictive conditions not plainly stated in the statute. We conclude that the public-benefit requirement is met in this case, as it was in *Collins*, 655 N.W.2d at 330, by the fact that Philip Morris made allegedly false representations to the general public, and we reject the argument that prior action by the attorney general deprives this lawsuit of public benefit. Subdivision 3a plainly provides that a private civil action for damages is "[i]n addition to the remedies otherwise provided by law."

### D. Effect of federal legislation

██ For the same reason, we conclude that the district court erred by holding that the Family Smoking Prevention and Tobacco Control Act, Pub.L. No. 111–31, § 101(b)(3), 123 Stat. 1776, 1812 (2009), banning the marketing of tobacco products using descriptors such as "light" and "low tar," makes it "impossible for [appellants'] suit to have any public benefit that the Act has not already conferred on the public." The Minnesota Legislature provided for a cause of action for individuals injured by violation of Minnesota's consumer-protection laws. There is nothing in the plain language of Minn.Stat. § 8.31, subd. 3a, or the public-benefit requirement added by the caselaw, that justifies dismissing an action simply because, subsequent to initiation of the action, federal legislation addresses the allegedly harmful conduct.

### E. Damages may provide public benefit

██ We also reject the district court's determination that appellants "cannot demonstrate that monetary recoveries for the class members here will have any effect on Philip Morris' conduct," and that receipt of "only ... monetary recovery for a large number of private individuals ... is not enough to establish a private benefit." The plain language of Minn.Stat. § 8.31, subd. 3a, provides for an action to recover damages. To the extent that the legislature intended to require a public-benefit element, it plainly intended that a monetary recovery could support such a benefit.

### F. Effect of release in Tobacco Settlement

██ The district court concluded that, even if appellants met the public-benefit requirement to maintain an action under Minn.Stat. § 8.31, subd. 3a, the action is barred by the release in the Tobacco Settlement. The language of the Tobacco Settlement relied on by the district court states that

> [t]he State of Minnesota shall release and forever discharge all Defendants ... from any and all manner of civil claims, demands, actions, suits and causes of action, [and] damages whenever incurred ... that the State of Minnesota (including any of its past, present, or future administrators, representatives, employees, officers, attorneys, agents, representatives, officials acting in their official capacities, agencies, departments, commissions, and divisions, and whether or not any such person or entity participates in the settlement), whether directly, indirectly, representatively, derivatively or in any other capacity, ever had, now has or hereinafter can, shall or may have, as follows:
>
> a. for past conduct ...; and
>
> b. for future conduct, only as to monetary Claims directly or indirectly based on, arising out of or in any way related to, in whole or in part, the use of or exposure to Tobacco Products manufactured in the ordinary course of business, including without limitation any future claims for reimbursement for health care costs allegedly associated with use of or exposure to Tobacco Products.

The district court concluded that appellants are directly or indirectly representatives of the state such that their claims have been released by the Tobacco Settlement. The district court relied on the common reference to Minn.Stat. § 8.31, subd. 3a, as the "private attorney general statute." The district court adopted the Minnesota federal district court's finding that an individual who pursues a claim as a private attorney general "assume[s] the role and duties of the attorney general

position as it relates to the enforcement of the law." *Kalmes Farms, Inc. v. J–Star Indus., Inc.,* No. Civ. 02–1141 (DWF/SRN), 2004 WL 114976, at *6 (D.Minn. Jan. 16, 2004). The district court also adopted the federal district court's notion that "the private litigant ... act[s] in the Attorney General's stead." *Behrens v. United Vaccines, Inc.,* 228 F.Supp.2d 965, 969 (D.Minn.2002). From these characterizations of the role of a "private attorney general," the district court concluded that appellants, to the extent that they assert that their claims involve a public benefit, "necessarily bring their claims 'indirectly, representatively, [or] derivatively' on behalf of the State and fall within the bar of the Release."

With all due respect to the federal district courts and the district court in this case, we conclude that there is no legal basis or binding authority requiring conversion of an action by private individuals into state action. *See Lake George Park, L.L.C. v. IBM Mid–America Emps. Fed. Credit Union,* 576 N.W.2d 463, 466 (Minn. App.1998) (stating that "[t]his court, as an error correcting court, is without authority to change the law"), *review denied* (Minn. June 17, 1998). Minn.Stat. § 8.31, subd. 3a, plainly provides that "[i]n addition to the remedies otherwise provided by law, any person injured by a violation" of the listed consumer-protection statutes "may bring a civil action" for such injuries. The statute does not limit such actions to situations in which the state has failed to act to enforce consumer-protection laws or provide that a person pursuing such an action becomes a representative of the state. The Tobacco Settlement states that "[e]xcept as expressly provided in this Settlement Agreement, no portion of this Settlement Agreement shall bind any nonparty or determine, limit or prejudice the rights of any such person or entity." We conclude that the district court erred by characterizing appellants' action as a state action and erred by concluding that the Tobacco Settlement bars appellants' claims under Minn.Stat. § 8.31, subd. 3a.

Because the appellants' claims meet the public-benefit test established by the supreme court and are not barred by the Tobacco Settlement release, we reverse the partial summary judgment dismissing appellants' Minn.Stat. § 8.31, subd. 3a, claims and remand for further proceedings on those claims.

## III. Dismissal of unjust-enrichment claim

The district court granted Philip Morris's motion to dismiss appellants' unjust-enrichment claim for failure to state a claim on which relief can be granted. "When reviewing a case dismissed pursuant to Minn. R. Civ. P. 12.02(e) for failure to state a claim on which relief can be granted, the question before [the reviewing] court is whether the complaint sets forth a legally sufficient claim for relief." *Hebert v. City of Fifty Lakes,* 744 N.W.2d 226, 229 (Minn.2008). Reviewing courts examine whether the district court properly dismissed a claim under Minn. R. Civ. P. 12.02 de novo. *Bodah v. Lakeville Motor Express, Inc.,* 663 N.W.2d 550, 553 (Minn.2003).

Unjust enrichment is an equitable doctrine that does not permit recovery where there is an adequate remedy at law. *Southtown Plumbing, Inc. v. Har–Ned Lumber Co.,* 493 N.W.2d 137, 140 (Minn. App.1992). The district court concluded that (1) appellants had an adequate legal remedy based on common-law fraud and under Minn.Stat. § 8.31, subd. 3a; (2) dismissal of the fraud claim and failure to meet the requirements to pursue their statutory remedy did not entitle appellants to equitable relief; and (3) appellants' un-

just-enrichment claim is barred by the Tobacco Settlement.

■ Because we have reinstated appellants' claims under Minn.Stat. § 8.31, subd. 3a, we affirm dismissal of appellants' unjust-enrichment claim based on the availability of a legal remedy. But, for the reasons stated above, we conclude that the district court erred in holding that appellants' unjust-enrichment claim is barred by the Tobacco Settlement release.

## IV. Denial of application of collateral estoppel

### A. Standard of review

■ Appellants challenge the district court's denial of their motion for partial summary judgment based on their assertion that, under principles of collateral estoppel, Philip Morris's violation of consumer-protection laws has been established by findings of fact and conclusions of law made in *DOJ*, 449 F.Supp.2d 1. "Whether collateral estoppel precludes litigation of an issue is a mixed question of law and fact that we review de novo." *Hauschildt v. Beckingham*, 686 N.W.2d 829, 837 (Minn.2004). "Once it is determined that collateral estoppel is available, the decision to apply the doctrine is left to the [district] court's discretion." *In re Trusts Created by Hormel*, 504 N.W.2d 505, 509 (Minn.App.1993), *review denied* (Minn. Oct. 19, 1993). "The district court's decision to apply [or not to apply] collateral estoppel will be reversed only upon a demonstrated abuse of discretion." *Pope Cnty. Bd. of Comm'rs v. Pryzmus*, 682 N.W.2d 666, 669 (Minn.App.2004), *review denied* (Minn. Sept. 29, 2004).

### B. Elements of collateral estoppel

■ In *Illinois Farmers Ins. Co. v. Reed*, we noted that "[t]he doctrine of collateral estoppel originated in the English

common law" and "is based on the judicial policy considerations of conservation of judicial resources, preservation of the courts' integrity by preventing inconsistent results, promotion of final judgments, and protection of parties from relitigating the same issues." 647 N.W.2d 553, 560 (Minn. App.2002), *rev'd on other grounds*, 662 N.W.2d 529, 529–30 (Minn.2003).

> Collateral estoppel bars the relitigation of an issue when: (1) the issue is identical to one in a prior adjudication; (2) there was a final judgment on the merits in the prior proceeding; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.... Collateral estoppel applies to issues actually litigated, determined by, and essential to a previous judgment. Collateral estoppel is an equitable doctrine, ... and courts do not apply it rigidly but "focus instead on whether an injustice would be worked upon the party upon whom the estoppel is urged[.]" The party invoking collateral estoppel has the burden of proof.

*Barth v. Stenwick*, 761 N.W.2d 502, 508 (Minn.App.2009) (quotations and citations omitted).

### C. Findings of fact and conclusions of law in *DOJ*

■ In *DOJ*, the United States alleged multiple acts of misconduct by eleven major U.S. tobacco companies, arguing that the companies defrauded consumers through misleading advertisements for low-tar cigarettes in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. 449 F.Supp.2d at 31–32. The United States sought equitable relief to prevent future RICO violations. *Id.* After a bench trial, the United States District Court for the District of Columbia conclud-

ed that "overwhelming" evidence, easily meeting the clear-and-convincing-evidence standard of proof, demonstrated that Philip Morris committed fraud. *Id.* at 888. The federal district court held that the tobacco companies, including Philip Morris, had violated RICO, and ordered injunctive and other corrective relief. *Id.* 937–45.

Appellants argue that the conclusions of law and many of the findings in *DOJ* should preclude relitigation of the same issues in the instant case. The findings that appellants seek to apply in this case, from among the thousands of findings in *DOJ,* include the following:

2023. For several decades, Defendants have marketed and promoted their low tar brands as being less harmful than conventional cigarettes. That claim is false, as these Findings of Fact demonstrate. By making these false claims, Defendants have given smokers an acceptable alternative to quitting smoking, as well as an excuse for not quitting.

2024. Defendants used a combination of techniques to market and promote their low tar brands. Defendants' marketing has emphasized claims of low tar and nicotine delivery accompanied by statements that smoking these brands would reduce exposure to the "controversial" elements of cigarette smoke (*i.e.,* tar). Since the 1970s, Defendants have also used so-called brand descriptors such as "light" and "ultra light" to communicate reassuring messages that these are healthier cigarettes and to suggest that smoking low tar cigarettes is an acceptable alternative to quitting. In addition to appealing advertising and easily-remembered brand descriptors, Defendants have used sophisticated marketing imagery such as lighter color cigarette packaging and white tipping paper to reinforce the same message

that these brands were low in tar and therefore less harmful.

2025. Even as they engaged in a campaign to market and promote filtered and low tar cigarettes as less harmful than conventional ones, Defendants either lacked evidence to substantiate their claims or knew them to be false. Indeed, internal industry documents reveal Defendants' awareness by the late 1960s/early 1970s that, because low tar cigarettes do not actually deliver the low levels of tar and nicotine which are advertised, they are unlikely to provide any clear health benefit to human smokers, as opposed to the FTC smoking machine, when compared to regular, full flavor cigarettes.

2026. As Defendants have long been aware, nicotine delivered by cigarettes is addictive. Defendants' internal documents demonstrate their understanding that, in order to obtain an amount of nicotine sufficient to satisfy their addiction, smokers of low tar cigarettes modify their smoking behavior, or "compensate," for the reduced nicotine yields by taking more frequent puffs, inhaling smoke more deeply, holding smoke in their lungs longer, covering cigarette ventilation holes with fingers or lips, and/or smoking more cigarettes. As a result of this nicotine-driven smoker behavior, smokers of light cigarettes boost their intake of tar, thus negating what Defendants have long promoted as the primary health-related benefit of light cigarettes: lower tar intake.

2027. Defendants did not disclose the full extent and depth of their knowledge and understanding of smoker compensation to the public health community or to government regulators.

2028. Defendants' conduct relating to low tar cigarettes was intended to further their overarching economic goal: to

keep smokers smoking; to stop smokers from quitting; to encourage people, especially young people, to start smoking; and to maintain or increase corporate profits.

*Id.* at 430–31 (citations omitted). Appellants also argue that Philip Morris should be bound, under the principles of collateral estoppel, by *DOJ* findings of fact 2146–2215, which describe Philip Morris's recognition that low-tar cigarettes are not less harmful than full-flavor cigarettes. Appellants also sought to establish that collateral estoppel bars relitigation of *DOJ* findings of fact 2401–04, 2410, 2411, and 2445–47, which describe Philip Morris's continued marketing and public statements suggesting that low-tar cigarettes are less harmful than full-flavor cigarettes, despite its knowledge of the contrary. *Id.* at 456–57, 513–14, 521–22.

Appellants argue that they seek to prove the very same facts in this case, asserting that, although the cause of action in *DOJ* was based on a different statute, the elements of Minnesota's CFA are satisfied by the findings of fact and conclusions of law in *DOJ*. Appellants assert that the two causes of action are identical for the purposes of applying collateral estoppel.

The district court did not address each element of collateral estoppel. It noted that the causes of action and relief sought in this case are not identical to those in *DOJ*. But the district court, citing *Walden Bros. Lumber Inc. v. Wiggin,* acknowledged that the cause of action need not be identical in both actions for collateral estoppel to apply. 408 N.W.2d 675, 677 (Minn.App.1987) (stating that for collateral estoppel to apply, the issues to be precluded must be identical, but the claims or causes of action need not be identical), *review denied* (Minn. Aug. 19, 1987). The district court concluded that "there may be a strong argument for the application of collateral estoppel." But the district court noted that Philip Morris has won similar cases brought against it and that the United States Supreme Court has stated that courts should not apply collateral estoppel where "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329–30, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979). Additionally, the district court found that, because the instant case will be tried to a jury and *DOJ* was a bench trial, Philip Morris should have the benefit of a jury determination, rather than applying collateral estoppel.

Ultimately, the district court acknowledged that it had the discretion to apply collateral estoppel as requested by appellants in this case but chose to exercise "its sound discretion in denying" appellants' motion for partial summary judgment based on collateral estoppel. Therefore, even if appellants are correct that application of the doctrine would not have been an abuse of discretion, they have failed to demonstrate that denying application of collateral estoppel in this case is a clear abuse of discretion. For that reason, we affirm the district court's exercise of its discretion to deny appellants' motion.

## V. Class certification

### A. Standard of review

 "Trial courts have considerable discretionary power to determine whether class actions may be maintained." *Streich v. Am. Family Mut. Ins. Co.,* 399 N.W.2d 210, 213 (Minn.App.1987), *review denied* (Minn. Mar. 25, 1987). "[I]t is clear that our review of [a] district court's certification decision should be for abuse of discretion." *Whitaker v. 3M Co.,* 764 N.W.2d 631, 635 (Minn.App.2009), *review denied* (Minn. July 22, 2009). By notice of a

related appeal, Philip Morris argues that the district court abused its discretion in granting class certification.

## B. Requirements for class action

Minn. R. Civ. P. 23.01 provides four prerequisites to a class action:

(a) the class is so numerous that joinder of all members is impracticable;

(b) there are questions of law or fact common to the class;

(c) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(d) the representative parties will fairly and adequately protect the interests of the class.

If the prerequisites are satisfied, one of three additional conditions contained in Minn. R. Civ. P. 23.02 must be met in order for an action to be maintained as a class action.

In this case, the parties agree that the condition applicable to this case is contained in Minn. R. Civ. P. 23.02(c), which provides that the court must find that

questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties

likely to be encountered in the management of a class action.

Minn. R. Civ. P. 23.02(c).

## C. Exercise of discretion

Initially, the district court denied class certification after considering all of the requirements for certification contained in Minn. R. Civ. P. 23, concluding that appellants failed to demonstrate that the questions of law or fact common to the members of the class predominate over questions affecting only individual members. The district court later granted appellants' request for reconsideration of the class certification decision and certified the class, finding that appellants "all have been similarly injured" and that "[w]ere there to be individual trials, the common aspects of ... Philip Morris's conduct would become a predominant aspect of each trial." The district court also stated that "[c]onsiderations of delay, and high costs provide additional support for the appropriateness of class certification," and concluded that "a class action is not only an appropriate method to resolve the plaintiffs' allegations, but pragmatically, the only method whereby purchasers of Marlboro Lights in Minnesota can seek redress for the alleged deception."

Philip Morris asserts that the district court, on reconsideration, misapplied the law and failed to require appellants to prove by a preponderance of evidence that the requirement of Minn. R. Civ. P. 23.02(c) has been met. Philip Morris focuses on the evidence required to establish causation but has not conceded that common questions predominate to establish statutory violations. The district court implicitly found that common questions predominate regarding statutory violations, and from our extensive review of the record, we conclude that this finding is amply supported by evidence in the record.

■ Causation is an element of a claim under Minn.Stat. § 8.31, subd. 3a. *Grp. Health,* 621 N.W.2d at 13. And

> [w]here ... the plaintiffs allege that their damages were caused by deceptive, misleading, or fraudulent statements or conduct in violation of the misrepresentation in sales laws, as a practical matter it is not possible that the damages could be caused by a violation without reliance on the statements or conduct alleged to violate the statutes. Therefore, in a case such as this, it will be necessary to prove reliance on those statements or conduct to satisfy the causation requirement.
>
> But [in cases where] damages are alleged to be caused by a lengthy course of prohibited conduct that affected a large number of consumers, the showing of reliance that must be made to prove a causal nexus need not include direct evidence of reliance by individual consumers of defendants' products. Rather, the causal nexus at its reliance component may be established by other direct or circumstantial evidence that the district court determines is relevant and probative as to the relationship between the claimed damages and the alleged prohibited conduct.... [The required causal nexus] may be proven by means other than direct evidence of reliance by individual consumers."

*Id.* at 14–15.

■ Philip Morris argues that the district court failed to conduct an inquiry into whether the required causation in this case is capable of proof at trial through evidence that is common to the class rather than individual members. *See Whitaker,* 764 N.W.2d at 638 (stating that because the nature of the evidence sufficient to resolve a question determines whether the question is common or individual, rule 23 certification requirements must be analyzed with specific reference to the cause of action asserted in a particular case; and holding that in an age discrimination case, statistical evidence may "bridge the gap between ... individual claims of discrimination and the existence of a class of similarly situated employees"). In *Whitaker,* this court held that to determine whether the requirements for class certification under rule 23 have been proved by a preponderance of the evidence, the district court "must address and resolve factual disputes relevant to class-certification requirements, including disputes among expert witnesses." *Id.* at 640.

Philip Morris asserts that appellants failed to offer any expert opinion to support their theory of common classwide proof and that the district court erred by failing to consider, in deciding the certification issue, Philip Morris's evidence that individual issues predominate. We disagree. The district court's analysis is not extensive, but it found that all members of the class have been similarly injured by Philip Morris's alleged lengthy course of prohibited conduct. And the record supports this finding.

Each of the class representatives testified in depositions that he or she thought that Lights were safer than regular cigarettes. Each class representative's testimony supports that he or she likely would not have purchased Lights if he or she had known that Philip Morris intentionally misrepresented Lights. And documents in the record, obtained from Philip Morris, demonstrate Philip Morris's early and continuing awareness of smokers' attitudes toward health issues, recognition of the market potential of a cigarette perceived by consumers to be healthier than regular cigarettes, and recognition that the reason smokers accept low-tar cigarettes is due to the health reassurance they seem to offer.

As in *Peterson v. BASF Corp.*, appellants in this case contend that "class members' awareness of [misleading] advertisements" provides a sufficient causal nexus between a violation of the consumer-protection statutes and damages in the form of restitution. 675 N.W.2d 57, 73 (Minn. 2004).[5] *Peterson* was a nationwide class action involving misleading advertisements that BASF used to persuade farmers to purchase a more expensive type of BASF herbicide after being led to believe that a less expensive BASF herbicide was inferior. *Id.* In *Peterson*, the supreme court stated that, based on the evidence in the record, "[t]he jury could infer from the advertisements and other evidence that but for BASF's *unconscionable conduct*," farmers in general would not have been induced to buy the product advertised such that "class members' awareness of advertisements may provide a sufficient causal nexus." *Id.*[6]

As we understand it, appellants' theory of damages is that, no matter what individual factors may have been involved in a class member's decision to purchase Lights, all consumers of Lights were led by false advertising to believe that Lights were healthier than regular cigarettes when they were not, such that purchasers are entitled to reimbursement for all amounts spent on the misrepresented cigarettes. Here, as in *Peterson*, appellants allege that the impact of the manufacturer's conduct on consumers was designed by the manufacturer to be the same for all members of the class: instilling a belief about the nature of a product. Therefore, the causal nexus is a question common to all class members.

Philip Morris argues that, if smoked in a particular manner, Lights may have delivered what was advertised, which makes the inquiry into the falseness of its claims an individual inquiry. But appellants counter that Philip Morris purposefully withheld this important information about smoking methods from all consumers and expended enormous sums in deceptive advertising (the prohibited conduct) to influence consumers to pay money (the damages claimed) for a misrepresented product.

*Group Health* instructs that the required causal nexus may be established when there is something to connect "the claimed damages and the alleged prohibited conduct." 621 N.W.2d at 14. The district court appropriately relied on supreme court cases issued after its initial denial of class certification for the proposition that the proof of causation required in consumer-protection class actions is less stringent than proof of causation required in actions for common-law fraud and does not require proof of individual reliance, but merely a causal relationship between the advertiser's actions and the alleged injury. *See Wiegand v. Walser Auto. Grps., Inc.*, 683 N.W.2d 807, 811–12 (Minn.2004) (stating that a showing of "individual consumer reliance" is not necessary to state a claim for damages under Minn.Stat. § 8.31, subd. 3a); *Peterson v. BASF Corp.*, 675

---

**5.** The United States Supreme Court later vacated the judgment and remanded *Peterson* to the Minnesota Supreme Court for reconsideration of a federal preemption issue. *BASF Corp. v. Peterson*, 544 U.S. 1012, 125 S.Ct. 1968, 161 L.Ed.2d 845 (2005). But on remand, the Minnesota Supreme Court affirmed its earlier ruling that the plaintiffs' claims were not preempted. *Peterson v. BASF Corp.*,

711 N.W.2d 470, 474, 479–82 (Minn.2006). For this reason, *Peterson*, 675 N.W.2d 57, remains law that continues to bind this court.

**6.** We recognize that *Peterson* discussed the causal nexus between misleading advertising and injury in the context of a challenge to a jury's award of damages, not class certification. 675 N.W.2d at 73.

N.W.2d 57, 73 (Minn.2004) (stating that a theory of liability based on the "causal relationship" between the advertiser's actions that resulted in plaintiffs "suffering a loss" was an appropriate inference by the jury). It can be inferred from Philip Morris's extensive marketing of Lights as a healthier alternative to traditional cigarettes that Philip Morris intended to convince consumers that its product was something other than Philip Morris allegedly knew it to be. Philip Morris has raised some questions that are unique to individual smokers, but has not, at this point in the litigation, negated the commonsense inference that its massive advertising campaign was successful in persuading consumers that Lights were healthier than regular cigarettes. We conclude that the district court's finding that causation questions common to all members of the class predominate over questions affecting individual class members is not clearly erroneous, and the district court did not abuse its discretion by certifying the class.

The district court's exercise of discretion in granting class certification is further supported by its recognition that "pragmatically, [class action is] the only method whereby purchasers of [Lights] in Minnesota can seek redress for the alleged deception." *See* 1 David F. Herr & Roger S. Haydock, *Minnesota Practice* § 23:8 (5th ed.2009) (stating that "[t]he analysis of Rule 23.02 is intended to be practical rather than theoretical, and is designed to permit cases in which the class action improves the efficiency of the resolution of claims to proceed as class actions, and to exclude those cases in which class treatment would not be advantageous"). We therefore affirm the district court's order certifying the class.[7]

## VI. Statute of limitations

### A. Standard of review

In its related appeal, Philip Morris asserts that the district court erred in denying its summary judgment motion seeking to limit appellants' claims based on the applicable statute of limitations. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. "In reviewing an appeal from the denial of summary judgment, we must determine whether there are genuine issues of material fact and whether the district court erred in applying the law." *Mumm v. Mornson,* 708 N.W.2d 475, 481 (Minn. 2006). We consider the evidence in the light most favorable to the nonmoving party. *Id.* A reviewing court reviews de novo whether there are genuine issues of material fact and "whether the district court erred in its application of the law." *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.,* 644 N.W.2d 72, 77 (Minn.2002).

### B. Statute of limitations on consumer-protection claims

A six-year statute of limitations applies to claims under Minnesota's consumer-protection statutes. Minn.Stat. § 541.05, subd. 1(2) (2008) (providing that actions on liability created by statute, other than those arising on a penalty or forfeiture or where a shorter period is provided by Minn.Stat. § 541.07 (2008), "shall be commenced within six years").

---

7. Minn. R. Civ. P. 23.03(a)(3) provides that a certification order may be altered or amended at any time before final judgment. Therefore, our holding does not limit the district court's future appropriate exercise of discretion on this issue.

This action was served on Philip Morris on November 28, 2001, and asserts claims dating back to 1971. The parties appear to agree that appellants' claims accrued, at the latest, on the date of each Lights purchase. Philip Morris argues that the district court erred in denying partial summary judgment excluding appellants' claims for purchases between 1971 and November 28, 1995, six years before the complaint was served. But appellants argue that fraudulent concealment of facts that establish their consumer-protection claims tolls the statute of limitations until the true facts could be discovered. *See Wild v. Rarig*, 302 Minn. 419, 448–50, 234 N.W.2d 775, 794–95 (1975) (explaining that the statute of limitations for defamation usually begins to run when the defamatory statement is published, but "[f]raudulent concealment of a defamatory publication will toll the 2–year statute of limitations until discovery or reasonable opportunity for discovery of the publication by the exercise of ordinary diligence"), *appeal dismissed, cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). The district court concluded that "an issue of fact remains as to whether Philip Morris fraudulently concealed facts which would have established [appellants'] cause of action," making summary judgment inappropriate. We agree.

We reject Philip Morris's assertion that the fraudulent concealment rule does not apply to consumer-protection actions. The argument is based on equating the doctrine of fraudulent concealment to the discovery rule. Philip Morris argues that "[b]ecause the discovery rule and the fraudulent concealment doctrine 'achieve the same result'—preventing the statute of limitations from running until the plaintiff

learns, or should learn, of his cause of action—where the discovery rule does not apply, neither does fraudulent concealment."

Philip Morris cites *Kopperud v. Agers*, 312 N.W.2d 443 (Minn.1981), to support this argument. In *Kopperud*, a question was certified from the district court to the supreme court, asking "whether equity tolls the statute of limitations for causes of action based on securities law violations when the plaintiffs allege that defendants fraudulently concealed the violations." 312 N.W.2d at 444, 446. Based on the language of Minn.Stat. § 80.26 (1971),[8] the supreme court concluded that the legislature "did not intend the fraudulent concealment rule for tolling purposes." *Id.* at 447. The supreme court noted that the statute "specifically limited actions for 'failure to disclose that the sale . . . made in violation of any of these [blue-sky] provisions' to 3 years from the date of delivery." *Id.* (alterations in original) (quoting Minn.Stat. 80.26 (1971)). And the supreme court concluded that the statutory "language expressly exclude[d] the fraudulent concealment exception *usually* applied." *Id.* (emphasis added).

In *Kopperud*, the plaintiffs had stated a timely cause of action for common-law fraud because the legislature specifically provided that a cause of action for common-law fraud does not accrue "until the discovery by the aggrieved party of the facts constituting the fraud." *Id.* at 446 (quoting Minn.Stat. § 541.05, subd. 1(6) (1971)). The supreme court was "mindful" that it has "followed the rule that fraudulent concealment of [a] cause of action will prevent the running of the statute of limitations," and stated that the "theoretical difference [between the discovery rule and

8. Minn.Stat. § 80.26 (1971), was repealed in 1973. 1973 Minn. Laws ch. 451, § 32, at 1021.

the fraudulent concealment rule] is that when the suit is for fraud, the statute does not begin to run until discovery, but when the suit is for another claim, the statute begins to run from the wrong but is tolled by defendant's fraudulent conduct." *Id.* at 446–47.

Contrary to Philip Morris's interpretation of *Kopperud,* the case stands for the proposition that, *absent express legislative intent to the contrary,* if the discovery rule does not apply to accrual of the applicable cause of action, fraudulent concealment will toll the running of the statute of limitations on the claim. *Id.* The parties agree that consumer-protection actions accrue when the violation occurs. But we hold that fraudulent concealment tolls the running of the statute of limitations because the legislature has not expressed intent to the contrary.

▆▆▆▆▆ Philip Morris argues that even if the fraudulent concealment rule applies, appellants have failed to produce evidence creating a genuine issue of material fact about whether fraudulent concealment occurred. We disagree. A genuine issue of material fact exists if a rational trier of fact, considering the record as a whole, could find for the party against whom summary judgment was granted. *Frieler v. Carlson Mktg. Grp., Inc.,* 751 N.W.2d 558, 564 (Minn.2008). "[I]f a party conceals a fact material to the transaction, and peculiarly within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such facts were expressly denied...." *Richfield Bank & Trust Co. v. Sjogren,* 309 Minn. 362, 365, 244 N.W.2d 648, 650 (1976) (quotation omitted).

In this case, the record is bursting with government documents, scientific studies, surveys, newspaper reports, "confidential" memos, affidavits, depositions, and other evidence describing who knew what and when it was known.[9] We conclude that the district court did not err by denying partial summary judgment based on the statute of limitations because material questions of fact exist concerning whether, and for what period, the statute of limitations may have been tolled by fraudulent concealment.

## DECISION

Appellants failed to establish that Altria used Philip Morris as its alter ego in Minnesota such that the doctrine of vicarious personal jurisdiction conferred jurisdiction over Altria. We therefore reverse the district court's denial of Altria's motion to dismiss for lack of personal jurisdiction.

The district court erred in dismissing appellants' claims under Minn.Stat. § 8.31, subd. 3a, because appellants have established a sufficient public benefit to maintain the action, and neither the attorney general's litigation against Philip Morris, nor recent federal legislation governing Philip Morris's conduct deprives this action of the public benefit required to pursue an action under Minn.Stat. § 8.31, subd. 3a. The district court also erred in concluding that appellants, in pursuing this action, act as agents or representatives of the state such that their claims are barred by the Tobacco Settlement release. We therefore reverse dismissal of appellants' claims under Minn.Stat. § 8.31, subd. 3a, and remand for further proceedings on those claims. Because we have reinstated

9. For example, appellants specifically point to Monograph 13, a 2001 National Cancer Institute study, describing the effects of low-tar cigarettes and advertising for low-tar cigarettes, arguing that the study proves that before 1999, it was impossible for scientists or consumers to obtain previously-concealed information on these subjects.

appellants' claims under Minn.Stat. § 8.31, subd. 3a, we affirm dismissal of appellants' unjust-enrichment claim based on the availability of a legal remedy.

The district court did not abuse its broad discretion in declining to apply the doctrine of non-mutual, offensive collateral estoppel under the circumstances of this case. And because the record sufficiently supports the district court's finding that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, the district court did not abuse its discretion in certifying the class.

We hold that fraudulent concealment can toll the six-year statute of limitations for actions based on a violation of Minnesota's consumer-protection statutes. But material-fact questions exist concerning whether Philip Morris fraudulently concealed facts that would have established appellants' cause of action. Therefore, the district court did not err in denying respondents' motion for partial summary judgment based on the statute of limitations.

**Affirmed in part, reversed in part, and remanded.**